FEDERAL TRADE COMMISSION *v.* CEMENT
INSTITUTE ET AL.

NO. 23.

Argued October 20–21, 1947.—Decided April·26, 1948.

684

*Charles H. Weston* and *Walter B. Wooden* argued the cause for petitioner. With them on the brief were *Solicitor General Perlman, Assistant Attorney General Sonnett, Robert G. Seaks, Philip Elman* and *W. T. Kelley.*

*William J. Donovan* argued the cause for the Cement Institute et al., respondents in Nos. 23, 24 and 34. With him on the brief were *George S. Leisure, Breck P. McAllister, James R. Withrow, Jr., Henry Herrick Bond, Ira C. Werle, Robert E. McKean, F. Carroll Taylor, James F. Oates, Jr., Russell J. Burt, A. O. Dawson, George W. Jaques, George Nebolsine, Harry Scherr, Horace G. Hitchcock, Paul Brown, J. T. Stokely, C. Alfred Capen, Edward D. Lyman, William M. Robinson, Charles H. Smith* and *Emil H. Molthan. Thomas J. McFadden* and *Francis A. Brick* were also of counsel.

*Herbert W. Clark* argued the cause for the Calaveras Cement Co. et al., respondents in Nos. 24 and 26. With him on the brief were *Walter C. Fox, Jr., Marshall P. Madison, Robert H. Gerdes, William J. Donovan, George S. Leisure* and *Edward D. Lyman.*

*Edward A. Zimmerman* argued the cause for respondent in No. 25. With him on the brief were *H. W. Norman* and *W. R. Engelhardt. A. K. Shipe* was also of counsel.

*Charles Wright, Jr.* argued the cause for respondent in No. 27. With him on the brief was *Laurence A. Masselink.*

*Herbert S. Little* argued the cause for respondent in No. 28. With him on the brief was *F. A. LeSourd.*

*S. Harold Shefelman* argued the cause and filed a brief for respondent in No. 29.

*Pierce Works* argued the cause for respondent in No. 30. With him on the brief was *Louis W. Myers.*

*Nathan L. Miller* argued the cause for the Universal Atlas Cement Co., respondent in No. 31. With him on the brief were *Roger M. Blough* and *John H. Hershberger.*

*Alex W. Davis* argued the cause for respondent in No. 32. With him on the brief was *Robert B. Murphey.*

No appearance for respondents in No. 33.

*Thurlow M. Gordon* and *Neil C. Head* filed a brief for the General Electric Co., as *amicus curiae,* supporting respondents in Nos. 23, 24 and 34.

MR. JUSTICE BLACK delivered the opinion of the Court.

We granted certiorari to review the decree of the Circuit Court of Appeals which, with one judge dissenting, vacated and set aside a cease and desist order issued by the Federal Trade Commission against the respondents. 157 F. 2d 533. Those respondents are: The Cement Institute, an unincorporated trade association composed of 74 corporations [1] which manufacture, sell and distribute cement; the 74 corporate members of the Institute; [2] and 21 individuals who are associated with the Institute. It took three years for a trial examiner to hear the evidence which consists of about 49,000 pages of oral testimony and 50,000 pages of exhibits. Even the findings and conclusions of the Commission cover 176 pages. The briefs with accompanying appendixes submitted by the parties contain more than 4,000 pages. The legal questions raised by the Commission and by the different re-

---

[1] The Commission dismissed the proceedings without prejudice against respondent Castalia Portland Cement Co., which went into bankruptcy.

[2] Respondent Valley Forge Cement Co. is associated with the Institute only by reason of its affiliation with a member company.

spondents are many and varied. Some contentions are urged by all respondents and can be jointly considered. Others require separate treatment. In order to keep our opinion within reasonable limits, we must restrict our record references to the minimum consistent with an adequate consideration of the legal questions we discuss.

The proceedings were begun by a Commission complaint of two counts. The first charged that certain alleged conduct set out at length constituted an unfair method of competition in violation of § 5 of the Federal Trade Commission Act. 38 Stat. 719, 15 U. S. C. § 45. The core of the charge was that the respondents had restrained and hindered competition in the sale and distribution of cement by means of a combination among themselves made effective through mutual understanding or agreement to employ a multiple basing point system of pricing. It was alleged that this system resulted in the quotation of identical terms of sale and identical prices for cement by the respondents at any given point in the United States. This system had worked so successfully, it was further charged, that for many years prior to the filing of the complaint, all cement buyers throughout the nation, with rare exceptions, had been unable to purchase cement for delivery in any given locality from any one of the respondents at a lower price or on more favorable terms than from any of the other respondents.

The second count of the complaint, resting chiefly on the same allegations of fact set out in Count I, charged that the multiple basing point system of sales resulted in systematic price discriminations between the customers of each respondent. These discriminations were made, it was alleged, with the purpose of destroying competition in price between the various respondents in violation of § 2 of the Clayton Act, 38 Stat. 730, as amended by the Robinson-Patman Act, 49 Stat. 1526. That section, with

certain conditions which need not here be set out, makes it "unlawful for any person engaged in commerce, . . . either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality . . . ."  15 U. S. C. § 13.

Resting upon its findings, the Commission ordered that respondents cease and desist from "carrying out any planned common course of action, understanding, agreement, combination, or conspiracy" to do a number of things, 37 F. T. C. 87, 258–262, all of which things, the Commission argues, had to be restrained in order effectively to restore individual freedom of action among the separate units in the cement industry.  Certain contentions with reference to the order will later require a more detailed discussion of its terms.  For the present it is sufficient to say that, if the order stands, its terms are broad enough to bar respondents from acting in concert to sell cement on a basing point delivered price plan which so eliminates competition that respondents' prices are always identical at any given point in the United States.

We shall not now detail the numerous contentions urged against the order's validity.  A statement of these contentions can best await the separate consideration we give them.

*Jurisdiction.*—At the very beginning we are met with a challenge to the Commission's jurisdiction to entertain the complaint and to act on it.  This contention is pressed by respondent Marquette Cement Manufacturing Co. and is relied upon by other respondents.  Count I of the complaint is drawn under the provision in § 5 of the Federal Trade Commission Act which declares that "Unfair methods of competition . . . are hereby declared unlawful." Marquette contends that the facts alleged in Count I do not constitute "an unfair method of competition" within the meaning of § 5.  Its argument runs this way: Count I in reality charges a combination to restrain trade.  Such

a combination constitutes an offense under § 1 of the Sherman Act which outlaws "Every . . . combination . . . in restraint of trade." 26 Stat. 209, 15 U. S. C. § 1. Section 4 of the Sherman Act provides that the Attorney General shall institute suits under the Act on behalf of the United States, and that the federal district courts shall have exclusive jurisdiction of such suits. Hence, continue respondents, the Commission, whose jurisdiction is limited to "unfair methods of competition," is without power to institute proceedings or to issue an order with regard to the combination in restraint of trade charged in Count I. Marquette then argues that since the fact allegations of Count I are the chief reliance for the charge in Count II, this latter count also must be interpreted as charging a violation of the Sherman Act. Assuming, without deciding, that the conduct charged in each count constitutes a violation of the Sherman Act, we hold that the Commission does have jurisdiction to conclude that such conduct may also be an unfair method of competition and hence constitute a violation of § 5 of the Federal Trade Commission Act.

As early as 1920 this Court considered it an "unfair method of competition" to engage in practices "against public policy because of their dangerous tendency unduly to hinder competition or create monopoly." *Federal Trade Comm'n* v. *Gratz,* 253 U. S. 421, 427. In 1922, the Court in *Federal Trade Comm'n* v. *Beech-Nut Packing Co.,* 257 U. S. 441, sustained a cease and desist order against a resale price maintenance plan because such a plan "necessarily constitutes a scheme which restrains the natural flow of commerce and the freedom of competition in the channels of interstate trade which it has been the purpose of all the anti-trust acts to maintain." *Id.* at 454. The Court, in holding that the scheme before it constituted an unfair method of competition, noted that

the conduct in question was practically identical with that previously declared unlawful in *Dr. Miles Medical Co.* v. *Park & Sons Co.*, 220 U. S. 373, and *United States* v. *Schrader's Son, Inc.*, 252 U. S. 85, the latter a suit brought under § 1 of the Sherman Act. Again in 1926 this Court sustained a Commission unfair-method-of-competition order against defendants who had engaged in a price-fixing combination, a plain violation of § 1 of the Sherman Act. *Federal Trade Comm'n* v. *Pacific States Paper Trade Assn.*, 273 U. S. 52. In 1941 we reiterated that certain conduct of a combination found to conflict with the policy of the Sherman Act could be suppressed by the Commission as an unfair method of competition. *Fashion Originators' Guild* v. *Federal Trade Comm'n*, 312 U. S. 457, 465. The Commission's order was sustained in the *Fashion Originators'* case not only because the prohibited conduct violated the Clayton Act but also because the Commission's findings brought the "combination in its entirety well within the inhibition of the policies declared by the Sherman Act itself." In other cases this Court has pointed out many reasons which support interpretation of the language "unfair methods of competition" in § 5 of the Federal Trade Commission Act as including violations of the Sherman Act.[3] Thus it appears that soon after its creation the Commission began to interpret the prohibitions of § 5 as including those restraints of trade which also were outlawed by the Sherman Act,[4] and

[3] *Federal Trade Comm'n* v. *R. F. Keppel & Bro.*, 291 U. S. 304, 310; *Federal Trade Comm'n* v. *Raladam Co.*, 283 U. S. 643, 649–650; see also *United States Alkali Assn.* v. *United States*, 325 U. S. 196, and see *Eugene Dietzgen Co.* v. *Federal Trade Comm'n*, 142 F. 2d 321, 326–327, and cases there cited, among the numerous Circuit Courts of Appeals cases on the same subject.

[4] "The Commission had issued up to October, 1939 a total of 267 orders to cease and desist in cases involving cooperation, conspiracy or combination." Beer, Federal Trade Law and Practice, 94 (1942). Other writers have also commented on the recognition by the Com-

that this Court has consistently approved that interpretation of the Act.

Despite this long and consistent administrative and judicial construction of § 5, we are urged to hold that these prior interpretations were wrong and that the term "unfair methods of competition" should not be construed as embracing any conduct within the ambit of the Sherman Act. In support of this contention, Marquette chiefly relies upon its reading of the legislative history of the Commission Act. We have given careful consideration to this contention because of the earnestness with which it is pressed. Marquette points to particular statements of some of the Act's sponsors which, taken out of their context, might lend faint support to its contention that Congress did not intend the Commission to concern itself with conduct then punishable under the Sherman Act. But on the whole the Act's legislative history shows a strong congressional purpose not only to continue enforcement of the Sherman Act by the Department of Justice and the federal district courts but also to supplement that enforcement through the administrative process of the new Trade Commission. Far from being regarded as a rival of the Justice Department and the district courts in dissolving combinations in restraint of trade, the new Commission was envisioned as an aid to them and was specifically authorized to assist them in the drafting of

mission and courts that unfair methods of competition include violations of the Sherman Act. Handler, *Unfair Competition and the Federal Trade Commission,* 8 G. W. L. Rev., 399, 416–417, 419. Montague, *The Commission's Jurisdiction Over Practices in Restraint of Trade: A Large-scale Method of Mass Enforcement of the Antitrust Laws,* 8 G. W. L. Rev. 365; Miller, Unfair Competition, Chapter XI (1941); Henderson, The Federal Trade Commission, a Study in Administrative Law and Procedure, 22–28 (1924); Beer, Federal Trade Law and Practice, 93 *et seq.* (1942).

appropriate decrees in antitrust litigation.[5] All of the committee reports and the statements of those in charge of the Trade Commission Act reveal an abiding purpose to vest both the Commission and the courts with adequate powers to hit at every trade practice, then existing or thereafter contrived, which restrained competition or might lead to such restraint if not stopped in its incipient stages. These congressional purposes are revealed in the legislative history cited below, most of which is referred to in respondents' briefs.[6] We can conceive of no greater obstacle this Court could create to the fulfillment of these congressional purposes than to inject into every Trade Commission proceeding brought under § 5 and into every Sherman Act suit brought by the Justice Department a possible jurisdictional question.

We adhere to our former rulings. The Commission has jurisdiction to declare that conduct tending to restrain trade is an unfair method of competition even though the selfsame conduct may also violate the Sherman Act.

There is a related jurisdictional argument pressed by Marquette which may be disposed of at this time. While review of the Commission's order was pending in the Circuit Court of Appeals, the Attorney General filed a civil action in the Federal District Court for Denver, Colorado,

---

[5] Section 7 of the Act empowered the Commission, upon the request of the district courts, to serve as a master in chancery in framing appropriate decrees in antitrust suits brought by the Attorney General. Section 6 (c) authorized the Commission to investigate compliance with antitrust decrees upon application of the Attorney General and to report its findings and recommendations to him. 38 Stat. 722, 15 U. S. C. §§ 47, 46.

[6] 51 Cong. Rec. 11083, 11104, 11528–11533, 12146, 12622–12623, 12733–12734, 12787, 13311–13312, 14251, 14460, 14926, 14929; H. R. Rep. No. 533, 63d Cong., 2d Sess. 1, 6 (1914); H. R. Rep. No. 1142, 63d Cong., 2d Sess. 18–19 (1914); Sen. Rep. No. 597, 63d Cong., 2d Sess. 12–13 (1914).

to restrain the Cement Institute, Marquette and 88 other
cement companies, including all of the present respond-
ents, from violating § 1 of the Sherman Act. Much of
the evidence before the Commission in this proceeding
might also be relevant in that case, which, we are in-
formed, has not thus far been brought to trial. Mar-
quette urges that the Commission proceeding should now
be dismissed because it is contrary to the public interest
to force respondents to defend both a Commission pro-
ceeding and a Sherman Act suit based largely on the same
alleged misconduct.

We find nothing to justify a holding that the filing of
a Sherman Act suit by the Attorney General requires the
termination of these Federal Trade Commission proceed-
ings. In the first place, although all conduct violative of
the Sherman Act may likewise come within the unfair
trade practice prohibitions of the Trade Commission Act,
the converse is not necessarily true. It has long been
recognized that there are many unfair methods of com-
petition that do not assume the proportions of Sherman
Act violations. *Federal Trade Comm'n* v. *R. F. Keppel
& Bro.,* 291 U. S. 304; *Federal Trade Comm'n* v. *Gratz,* 253
U. S. 421, 427. Hence a conclusion that respondents' con-
duct constituted an unfair method of competition does
not necessarily mean that their same activities would also
be found to violate § 1 of the Sherman Act. In the
second place, the fact that the same conduct may con-
stitute a violation of both acts in nowise requires us
to dismiss this Commission proceeding. Just as the Sher-
man Act itself permits the Attorney General to bring
simultaneous civil and criminal suits against a defendant
based on the same misconduct, so the Sherman Act and
the Trade Commission Act provide the Government with
cumulative remedies against activity detrimental to com-
petition. Both the legislative history of the Trade Com-
mission Act and its specific language indicate a congres-

sional purpose, not to confine each of these proceedings within narrow, mutually exclusive limits, but rather to permit the simultaneous use of both types of proceedings. Marquette's objections to the Commission's jurisdiction are overruled.

*Objections to Commission's Jurisdiction by Certain Respondents on Ground That They Were Not Engaged in Interstate Commerce.*—One other challenge to the Commission's jurisdiction is specially raised by Northwestern Portland and Superior Portland. The Commission found that "Northwestern Portland makes no sales or shipments outside the State of Washington," and that "Superior Portland, with few exceptions, makes sales and shipments outside the State of Washington only to Alaska." These two respondents contend that, since they did not engage in interstate commerce and since § 5 of the Trade Commission Act applies only to unfair methods of competition in interstate commerce, the Commission was without jurisdiction to enter an order against them under Count I of the complaint. For this contention they chiefly rely on *Federal Trade Comm'n* v. *Bunte Bros.,* 312 U. S. 349. They also argue that for the same reason the Commission lacked jurisdiction to enforce against them the price discrimination charge in Count II of the complaint.

We cannot sustain this contention. The charge against these respondents was not that they, apart from the other respondents, had engaged in unfair methods of competition and price discriminations simply by making intrastate sales. Instead, the charge was, as supported by the Commission's findings, that these respondents in combination with others agreed to maintain a delivered price system in order to eliminate price competition in the sale of cement in interstate commerce. The combination, as found, includes the Institute and cement companies located in many different states. The Commission has further found that "In general, said corporate respondents

have maintained, and now maintain, a constant course of trade and commerce in cement among and between the several States of the United States." The fact that one or two of the numerous participants in the combination happen to be selling only within the borders of a single state is not controlling in determining the scope of the Commission's jurisdiction. The important factor is that the concerted action of all of the parties to the combination is essential in order to make wholly effective the restraint of commerce among the states.[7] The Commission would be rendered helpless to stop unfair methods of competition in the form of interstate combinations and conspiracies if its jurisdiction could be defeated on a mere showing that each conspirator had carefully confined his illegal activities within the borders of a single state. We hold that the Commission did have jurisdiction to make an order against Superior Portland and Northwestern Portland.

*The Multiple Basing Point Delivered Price System.*— Since the multiple basing point delivered price system of fixing prices and terms of cement sales is the nub of this controversy, it will be helpful at this preliminary stage to point out in general what it is and how it works. A brief reference to the distinctive characteristics of "factory" or "mill prices" and "delivered prices" is of importance to an understanding of the basing point delivered price system here involved.

Goods may be sold and delivered to customers at the seller's mill or warehouse door or may be sold free on board (f. o. b.) trucks or railroad cars immediately adjacent to the seller's mill or warehouse. In either event the actual cost of the goods to the purchaser is, broadly speaking, the seller's "mill price" plus the purchaser's cost of

---

[7] See *Ramsay Co.* v. *Bill Posters Assn.*, 260 U. S. 501, 511; *Stevens Co.* v. *Foster & Kleiser Co.*, 311 U. S. 255, 260–261; *United States* v. *Frankfort Distilleries*, 324 U. S. 293, 297–298.

transportation. However, if the seller fixes a price at which he undertakes to deliver goods to the purchaser where they are to be used, the cost to the purchaser is the "delivered price." A seller who makes the "mill price" identical for all purchasers of like amount and quality simply delivers his goods at the same place (his mill) and for the same price (price at the mill). He thus receives for all f. o. b. mill sales an identical net amount of money for like goods from all customers. But a "delivered price" system creates complications which may result in a seller's receiving different net returns from the sale of like goods. The cost of transporting 500 miles is almost always more than the cost of transporting 100 miles. Consequently if customers 100 and 500 miles away pay the same "delivered price," the seller's net return is less from the more distant customer. This difference in the producer's net return from sales to customers in different localities under a "delivered price" system is an important element in the charge under Count I of the complaint and is the crux of Count II.

The best known early example of a basing point price system was called "Pittsburgh plus." It related to the price of steel. The Pittsburgh price was the base price, Pittsburgh being therefore called a price basing point. In order for the system to work, sales had to be made only at delivered prices. Under this system the delivered price of steel from anywhere in the United States to a point of delivery anywhere in the United States was in general the Pittsburgh price plus the railroad freight rate from Pittsburgh to the point of delivery.[8] Take Chicago, Illinois, as an illustration of the operation and consequences

---

[8] This was not true as to steel produced and shipped from Birmingham, Alabama. Under the system Birmingham steel had to be sold at the Pittsburgh price plus an arbitrary addition of $5 per ton. There were also other minor variations from the system as here described. See *United States Steel Corp. et al.*, 8 F. T. C. 1.

of the system. A Chicago steel producer was not free to sell his steel at cost plus a reasonable profit. He must sell it at the Pittsburgh price plus the railroad freight rate from Pittsburgh to the point of delivery. Chicago steel customers were by this pricing plan thus arbitrarily required to pay for Chicago produced steel the Pittsburgh base price plus what it would have cost to ship the steel by rail from Pittsburgh to Chicago had it been shipped. The theoretical cost of this fictitious shipment became known as "phantom freight." But had it been economically possible under this plan for a Chicago producer to ship his steel to Pittsburgh, his "delivered price" would have been merely the Pittsburgh price, although he actually would have been required to pay the freight from Chicago to Pittsburgh. Thus the "delivered price" under these latter circumstances required a Chicago (non-basing point) producer to "absorb" freight costs. That is, such a seller's net returns became smaller and smaller as his deliveries approached closer and closer to the basing point.

Several results obviously flow from use of a single basing point system such as "Pittsburgh plus" originally was. One is that the "delivered prices" of all producers in every locality where deliveries are made are always the same regardless of the producers' different freight costs. Another is that sales made by a non-base mill for delivery at different localities result in net receipts to the seller which vary in amounts equivalent to the "phantom freight" included in, or the "freight absorption" taken from the "delivered price."

As commonly employed by respondents, the basing point system is not single but multiple. That is, instead of one basing point, like that in "Pittsburgh plus," a number of basing point localities are used. In the multiple basing point system, just as in the single basing point system, freight absorption or phantom freight is an ele-

ment of the delivered price on all sales not governed by a basing point actually located at the seller's mill.[9]  And all sellers quote identical delivered prices in any given locality regardless of their different costs of production and their different freight expenses.  Thus the multiple and single systems function in the same general manner and produce the same consequences—identity of prices and diversity of net returns.[10]  Such differences

---

[9] A base mill selling cement for delivery at a point outside the area in which its base price governs, and inside the area where another base mill's lower delivered price governs, adopts the latter's lower delivered price.  The first base mill thus absorbs freight and becomes as to such sales a non-base mill.

[10] The Commission in its findings explained how the multiple basing point system affects a seller's net return on sales in different localities and how the delivered price is determined at any particular point. "Substantially all sales of cement by the corporate respondents are made on the basis of a delivered price; that is, at a price determined by the location at which actual delivery of the cement is made to the purchaser.  In determining the delivered price which will be charged for cement at any given location, respondents use a multiple basing-point system.  The formula used to make this system operative is that the delivered price at any location shall be the lowest combination of base price plus all-rail freight.  Thus, if mill A has a base price of $1.50 per barrel, its delivered price at each location where it sells cement will be $1.50 per barrel plus the all-rail freight from its mill to the point of delivery, except that when a sale is made for delivery at a location at which the combination of the base price plus all-rail freight from another mill is a lower figure, mill A uses this lower combination so that its delivered price at such location will be the same as the delivered price of the other mill.  At all locations where the base price of mill A plus freight is the lowest combination, mill A recovers $1.50 net at the mill, and at locations where the combination of base price plus freight of another mill is lower, mill A shrinks its mill net sufficiently to equal that price.  Under these conditions it is obvious that the highest mill net which can be recovered by mill A is $1.50 per barrel, and on sales where it has been necessary to shrink its mill net in order to match the delivered price of another mill, its net recovery at the mill is less than $1.50."  37 F. T. C. at 147–148.

as there are in matters here pertinent are therefore differences of degree only.

*Alleged Bias of the Commission.*—One year after the taking of testimony had been concluded and while these proceedings were still pending before the Commission, the respondent Marquette asked the Commission to disqualify itself from passing upon the issues involved. Marquette charged that the Commission had previously prejudged the issues, was "prejudiced and biased against the Portland cement industry generally," and that the industry and Marquette in particular could not receive a fair hearing from the Commission. After hearing oral argument the Commission refused to disqualify itself. This contention, repeated here, was also urged and rejected in the Circuit Court of Appeals one year before that court reviewed the merits of the Commission's order. *Marquette Cement Mfg. Co.* v. *Federal Trade Comm'n*, 147 F. 2d 589.

Marquette introduced numerous exhibits intended to support its charges. In the main these exhibits were copies of the Commission's reports made to Congress or to the President, as required by § 6 of the Trade Commission Act. 15 U. S. C. § 46. These reports, as well as the testimony given by members of the Commission before congressional committees, make it clear that long before the filing of this complaint the members of the Commission at that time, or at least some of them, were of the opinion that the operation of the multiple basing point system as they had studied it was the equivalent of a price fixing restraint of trade in violation of the Sherman Act. We therefore decide this contention, as did the Circuit Court of Appeals, on the assumption that such an opinion had been formed by the entire membership of the Commission as a result of its prior official investigations. But we also agree with that court's holding that this belief did not disqualify the Commission.

In the first place, the fact that the Commission had entertained such views as the result of its prior *ex parte* investigations did not necessarily mean that the minds of its members were irrevocably closed on the subject of the respondents' basing point practices. Here, in contrast to the Commission's investigations, members of the cement industry were legally authorized participants in the hearings. They produced evidence—volumes of it. They were free to point out to the Commission by testimony, by cross-examination of witnesses, and by arguments, conditions of the trade practices under attack which they thought kept these practices within the range of legally permissible business activities.

Moreover, Marquette's position, if sustained, would to a large extent defeat the congressional purposes which prompted passage of the Trade Commission Act. Had the entire membership of the Commission disqualified in the proceedings against these respondents, this complaint could not have been acted upon by the Commission or by any other government agency. Congress has provided for no such contingency. It has not directed that the Commission disqualify itself under any circumstances, has not provided for substitute commissioners should any of its members disqualify, and has not authorized any other government agency to hold hearings, make findings, and issue cease and desist orders in proceedings against unfair trade practices.[11] Yet if Marquette is right, the Commission, by making studies and filing reports in obedience to congressional command, completely immunized the practices investigated, even though they are "unfair," from any cease and desist order by the Commission or any other governmental agency.

---

[11] Marquette in support of its motion to disqualify the Commission urged that the Department of Justice and the Commission had concurrent power or jurisdiction to enforce the prohibitions of the Sherman Act. 147 F. 2d at 593.

There is no warrant in the Act for reaching a conclusion which would thus frustrate its purposes. If the Commission's opinions expressed in congressionally required reports would bar its members from acting in unfair trade proceedings, it would appear that opinions expressed in the first basing point unfair trade proceeding would similarly disqualify them from ever passing on another. See *Morgan* v. *United States,* 313 U. S. 409, 421. Thus experience acquired from their work as commissioners would be a handicap instead of an advantage. Such was not the intendment of Congress. For Congress acted on a committee report stating: "It is manifestly desirable that the terms of the commissioners shall be long enough to give them an opportunity to acquire the expertness in dealing with these special questions concerning industry that comes from experience." Report of Committee on Interstate Commerce, No. 597, June 13, 1914, 63d Cong., 2d Sess. 10–11.

Marquette also seems to argue that it was a denial of due process for the Commission to act in these proceedings after having expressed the view that industry-wide use of the basing point system was illegal. A number of cases are cited as giving support to this contention. *Tumey* v. *Ohio,* 273 U. S. 510, is among them. But it provides no support for the contention. In that case Tumey had been convicted of a criminal offense, fined, and committed to jail by a judge who had a direct, personal, substantial, pecuniary interest in reaching his conclusion to convict. A criminal conviction by such a tribunal was held to violate procedural due process. But the Court there pointed out that most matters relating to judicial disqualification did not rise to a constitutional level. *Id.* at 523.

Neither the *Tumey* decision nor any other decision of this Court would require us to hold that it would be a violation of procedural due process for a judge to sit in

a case after he had expressed an opinion as to whether certain types of conduct were prohibited by law. In fact, judges frequently try the same case more than once and decide identical issues each time, although these issues involve questions both of law and fact. Certainly, the Federal Trade Commission cannot possibly be under stronger constitutional compulsions in this respect than a court.[12]

The Commission properly refused to disqualify itself. We thus need not review the additional holding of the Circuit Court of Appeals that Marquette's objection on the ground of the alleged bias of the Commission was filed too late in the proceedings before that agency to warrant consideration.

*Alleged Errors* in re *Introduction of Evidence.*—The complaint before the Commission, filed July 2, 1937, alleged that respondents had maintained an illegal combination for "more than 8 years last past." In the Circuit Court of Appeals and in this Court the Government treated its case on the basis that the combination began in August, 1929, when the respondent Cement Institute was organized. The Government introduced much evidence over respondents' objections, however, which showed the activities of the cement industry for many years prior to 1929, some of it as far back as 1902. It also introduced evidence as to respondents' activities from 1933 to May 27, 1935, much of which related to the preparation and administration of the NRA Code for the cement industry pursuant to the National Industrial Recovery Act, 48 Stat. 195, held invalid by this Court

---

[12] "Section 5 of the Federal Trade Commission Act does not provide private persons with an administrative remedy for private wrongs." The Commission is not a court. It can render no judgment, civil or criminal. *Federal Trade Comm'n* v. *Klesner*, 280 U. S. 19, 25; and see *Humphrey's Executor* v. *United States*, 295 U. S. 602, 628; *Louisville & N. R. Co.* v. *Garrett*, 231 U. S. 298, 307.

May 27, 1935, in *Schechter Poultry Corp.* v. *United States,* 295 U. S. 495. All of the testimony to which objection was made related to the initiation, development, and carrying on of the basing point practices.

Respondents contend that the pre-1929 evidence, especially that prior to 1919, is patently inadmissible with reference to a 1929 combination, many of whose alleged members were non-existent in 1919. They also urge that evidence of activities during the NRA period was improperly admitted because § 5 of Title I of the NRA provided that any action taken in compliance with the code provisions of an industry should be "exempt from the provisions of the antitrust laws of the United States." And some of the NRA period testimony relating to basing point practices did involve references to code provisions. The Government contends that evidence of both the pre-1929 and the NRA period activities of members of the cement industry tends to show a continuous course of concerted efforts on the part of the industry, or at least most of it, to utilize the basing point system as a means to fix uniform terms and prices at which cement would be sold, and that the Commission had properly so regarded this evidence. The Circuit Court of Appeals agreed with respondents that the Commission had erroneously considered both the NRA period evidence and the pre-1929 evidence in making its findings of the existence of a combination among respondents.

We conclude that both types of evidence were admissible for the purpose of showing the existence of a continuing combination among respondents to utilize the basing point pricing system.[13]

The Commission did not make its findings of post-1929 combination, in whole or in part, on the premise that

---

[13] We need not here determine what protection was afforded respondents by the exemption from the antitrust laws conferred by the Act later held unconstitutional. Nor need we decide whether this

any of respondents' pre-1929 or NRA code activities were illegal. The consideration given these activities by the Commission was well within the established judicial rule of evidence that testimony of prior or subsequent transactions, which for some reason are barred from forming the basis for a suit, may nevertheless be introduced if it tends reasonably to show the purpose and character of the particular transactions under scrutiny. *Standard Oil Co.* v. *United States,* 221 U. S. 1, 46–47; *United States* v. *Reading Co.,* 253 U. S. 26, 43–44. Here the trade practices of an entire industry were under consideration. Respondents, on the one hand, insisted that the multiple basing point delivered price system represented a natural evolution of business practices adopted by the different cement companies, not in concert, but separately in response to customers' needs and demands. That the separately adopted business practices produced uniform terms and conditions of sale in all localities was, so the respondents contended, nothing but an inevitable result of long-continued competition. On the other hand, the Government contended that, despite shifts in ownership of individual cement companies, what had taken place from 1902 to the date the complaint was filed showed continued concerted action on the part of all cement producers to develop and improve the basing point system so that it would automatically eliminate competition. In the Government's view the Institute when formed in 1929 simply took up the old practices for the old purpose and aided its member companies to carry it straight on through and beyond the NRA period. See *Fort Howard Paper Co.* v. *Federal Trade Comm'n,* 156 F. 2d 899, 906.

Furthermore, administrative agencies like the Federal Trade Commission have never been restricted by the

provision also exempted respondents from the unfair methods of competition provisions of the Trade Commission Act. The Government does not press either contention here.

rigid rules of evidence. *Interstate Commerce Comm'n* v. *Baird,* 194 U. S. 25, 44. And of course rules which bar certain types of evidence in criminal or quasi-criminal cases are not controlling in proceedings like this, where the effect of the Commission's order is not to punish or to fasten liability on respondents for past conduct but to ban specific practices for the future in accordance with the general mandate of Congress.

The foregoing likewise largely answers respondents' contention that there was error in the admission of a letter written by one Treanor in 1934 to the chairman of the NRA code authority for the cement industry. Treanor, who died prior to the filing of the complaint, was at the time president of one of the respondent companies and also an active trustee of the Institute. In the letter he stated among other things that the cement industry was one "above all others that cannot stand free competition, that must systematically restrain competition or be ruined." This statement was made as part of his criticism of the cement industry's publicity campaign in defense of the basing point system. The relevance of this statement indicating this Institute official's informed judgment is obvious. That it might be only his conclusion does not render the statement inadmissible in this administrative proceeding.

All contentions in regard to the introduction of testimony have been considered. None of them justify refusal to enforce this order.

*The Old Cement Case.*—This Court's opinion in *Cement Mfrs. Protective Assn.* v. *United States,* 268 U. S. 588, known as the *Old Cement* case, is relied on by the respondents in almost every contention they present. We think it has little relevance, if any at all, to the issues in this case.

In that case the United States brought an action in the District Court to enjoin an alleged combination to violate

§ 1 of the Sherman Act. The respondents were the Cement Manufacturers Protective Association, four of its officers, and nineteen cement manufacturers. The District Court held hearings, made findings of fact, and issued an injunction against those respondents. This Court, with three justices dissenting, reversed upon a review of the evidence. It did so because the Government did not charge and the record did not show "any agreement or understanding between the defendants placing limitations on either prices or production," or any agreement to utilize the basing point system as a means of fixing prices. The Court said "But here the Government does not rely upon agreement or understanding, and this record wholly fails to establish, either directly or by inference, any concerted action other than that involved in the gathering and dissemination of pertinent information with respect to the sale and distribution of cement to which we have referred; and it fails to show any effect on price and production except such as would naturally flow from the dissemination of that information in the trade and its natural influence on individual action." *Id.* at 606. In the *Old Cement* case and in *Maple Flooring Assn.* v. *United States,* 268 U. S. 563, decided the same day, the Court's attention was focused on the rights of a trade association, despite the Sherman Act, openly to gather and disseminate statistics and information as to production costs, output, past prices, merchandise on hand, specific job contracts, freight rates, etc., so long as the Association did these things without attempts to foster agreements or concerted action with reference to prices, production, or terms of sale. Such associations were declared guiltless of violating the Sherman Act, because "in fact, no prohibited concert of action was found." *Corn Products Co.* v. *Federal Trade Comm'n,* 324 U. S. 726, 735.

The Court's holding in the *Old Cement* case would not have been inconsistent with a judgment sustaining the Commission's order here, even had the two cases been before this Court the same day. The issues in the present Commission proceedings are quite different from those in the *Old Cement* case, although many of the trade practices shown here were also shown there. In the first place, unlike the *Old Cement* case, the Commission does here specifically charge a combination to utilize the basing point system as a means to bring about uniform prices and terms of sale. And here the Commission has focused attention on this issue, having introduced evidence on the issue which covers thousands of pages. Furthermore, unlike the trial court in the *Old Cement* case, the Commission has specifically found the existence of a combination among respondents to employ the basing point system for the purpose of selling at identical prices.

In the second place, individual conduct, or concerted conduct, which falls short of being a Sherman Act violation may as a matter of law constitute an "unfair method of competition" prohibited by the Trade Commission Act. A major purpose of that Act, as we have frequently said, was to enable the Commission to restrain practices as "unfair" which, although not yet having grown into Sherman Act dimensions would, most likely do so if left unrestrained. The Commission and the courts were to determine what conduct, even though it might then be short of a Sherman Act violation, was an "unfair method of competition." This general language was deliberately left to the "commission and the courts" for definition because it was thought that "There is no limit to human inventiveness in this field"; that consequently, a definition that fitted practices known to lead towards an unlawful restraint of trade today would not fit tomorrow's new inventions in the field; and that for Congress to try to keep its precise definitions abreast of this course of conduct

would be an "endless task." See *Federal Trade Commission* v. *R. F. Keppel & Bro.*, 291 U. S. 304, 310–312, and congressional committee reports there quoted.

These marked differences between what a court must decide in a Sherman Act proceeding and the duty of the Commission in determining whether conduct is to be classified as an unfair method of competition are enough in and of themselves to make the *Old Cement* decision wholly inapplicable to our problem in reviewing the findings in this case. That basic problem is whether the Commission made findings of concerted action, whether those findings are supported by evidence, and if so whether the findings are adequate as a matter of law to sustain the Commission's conclusion that the multiple basing point system as practiced constitutes an "unfair method of competition," because it either restrains free competition or is an incipient menace to it.

*Findings and Evidence.*—It is strongly urged that the Commission failed to find, as charged in both counts of the complaint, that the respondents had by combination, agreements, or understandings among themselves utilized the multiple basing point delivered price system as a restraint to accomplish uniform prices and terms of sale. A subsidiary contention is that assuming the Commission did so find, there is no substantial evidence to support such a finding. We think that adequate findings of combination were made and that the findings have support in the evidence.

The Commission's findings of fact set out at great length and with painstaking detail numerous concerted activities carried on in order to make the multiple basing point system work in such way that competition in quality, price and terms of sale of cement would be nonexistent, and that uniform prices, job contracts, discounts, and terms of sale would be continuously maintained. The Commission found that many of these activities

were carried on by the Cement Institute, the industry's unincorporated trade association, and that in other instances the activities were under the immediate control of groups of respondents. Among the collective methods used to accomplish these purposes, according to the findings, were boycotts; discharge of uncooperative employees; organized opposition to the erection of new cement plants; selling cement in a recalcitrant price cutter's sales territory at a price so low that the recalcitrant was forced to adhere to the established basing point prices; discouraging the shipment of cement by truck or barge; and preparing and distributing freight rate books which provided respondents with similar figures to use as actual or "phantom" freight factors, thus guaranteeing that their delivered prices (base prices plus freight factors) would be identical on all sales whether made to individual purchasers under open bids or to governmental agencies under sealed bids. These are but a few of the many activities of respondents which the Commission found to have been done in combination to reduce or destroy price competition in cement. After having made these detailed findings of concerted action, the Commission followed them by a general finding that "the capacity, tendency, and effect of the combination maintained by the respondents herein in the manner aforesaid . . . is to . . . promote and maintain their multiple basing-point delivered-price system and obstruct and defeat any form of competition which threatens or tends to threaten the continued use and maintenance of said system and the uniformity of prices created and maintained by its use." [14] The Commission then concluded

[14] Paragraph 26 of the Findings is as follows:

"The Commission concludes from the evidence of record and therefore finds that the capacity, tendency, and effect of the combination maintained by the respondents herein in the manner aforesaid and the acts and practices performed thereunder and in connection therewith by said respondents, as set out herein, has been and is to hinder,

that "The aforesaid combination and acts and practices of respondents pursuant thereto and in connection therewith, as hereinabove found, under the conditions and circumstances set forth, constitute unfair methods of competition in commerce within the intent and meaning of the Federal Trade Commission Act." And the Commission's cease and desist order prohibited respondents "from entering into, continuing, cooperating in, or carrying out any planned common course of action, understanding, agreement, combination, or conspiracy between and among any two or more of said respondents . . ." to do certain things there enumerated.

Thus we have a complaint which charged collective action by respondents designed to maintain a sales tech-

lessen, restrain, and suppress competition in the sale and distribution of cement in, among, and between the several States of the United States; to deprive purchasers of cement, both private and governmental, of the benefits of competition in price; to systematically maintain artificial and monopolistic methods and prices in the sale and distribution of cement, including common rate factors used and useful in the pricing of cement; to prevent purchasers from utilizing motortrucks or water carriers for the transportation of cement and from obtaining benefits which might accrue from the use of such transportation agencies; to require that purchases of cement be made on a delivered price basis, and to prevent and defeat efforts of purchasers to avoid this requirement; frequently to deprive agencies of the Federal Government of the benefits of all or a part of the lower land-grant rates available to such purchasers; to require certain agencies of the Federal Government to purchase their requirements of cement through dealers at higher prices than are available in direct purchases from manufacturers; to establish and maintain an agreed classification of customers who may purchase cement from manufacturers thereof; to maintain uniform terms and conditions of sale; to hinder and obstruct the sale of imported cement through restraints upon those who deal in such cement; and otherwise to promote and maintain their multiple basing-point delivered-price system and obstruct and defeat any form of competition which threatens or tends to threaten the continued use and maintenance of said system and the uniformity of prices created and maintained by its use." 37 F. T. C. at 257–258.

nique that restrained competition, detailed findings of collective activities by groups of respondents to achieve that end, then a general finding that respondents maintained the combination, and finally an order prohibiting the continuance of the combination. It seems impossible to conceive that anyone reading these findings in their entirety could doubt that the Commission found that respondents collectively maintained a multiple basing point delivered price system for the purpose of suppressing competition in cement sales. The findings are sufficient. The contention that they are not is without substance.

Disposition of this question brings us to the related contention that there was no substantial evidence to support the findings. We might well dispose of the contention as this Court dismissed a like one with reference to evidence and findings in a civil suit brought under the Sherman Act in *Sugar Institute* v. *United States,* 297 U. S. 553, 601: "After a hearing of extraordinary length, in which no pertinent fact was permitted to escape consideration, the trial court subjected the evidence to a thorough and acute analysis which has left but slight room for debate over matters of fact. Our examination of the record discloses no reason for overruling the court's findings in any matter essential to our decision." In this case, which involves the evidence and findings of the Federal Trade Commission, we likewise see no reason for upsetting the essential findings of the Commission. Neither do we find it necessary to refer to all the voluminous testimony in this record which tends to support the Commission's findings.

Although there is much more evidence to which reference could be made, we think that the following facts shown by evidence in the record, some of which are in dispute, are sufficient to warrant the Commission's finding of concerted action.

When the Commission rendered its decision there were about 80 cement manufacturing companies in the United

States operating about 150 mills. Ten companies controlled more than half of the mills and there were substantial corporate affiliations among many of the others. This concentration of productive capacity made concerted action far less difficult than it would otherwise have been. The belief is prevalent in the industry that because of the standardized nature of cement, among other reasons, price competition is wholly unsuited to it. That belief is historic. It has resulted in concerted activities to devise means and measures to do away with competition in the industry. Out of those activities came the multiple basing point delivered price system. Evidence shows it to be a handy instrument to bring about elimination of any kind of price competition. The use of the multiple basing point delivered price system by the cement producers has been coincident with a situation whereby for many years, with rare exceptions, cement has been offered for sale in every given locality at identical prices and terms by all producers. Thousands of secret sealed bids have been received by public agencies which corresponded in prices of cement down to a fractional part of a penny.[15]

---

[15] The following is one among many of the Commission's findings as to the identity of sealed bids:

An abstract of the bids for 6,000 barrels of cement to the United States Engineer Office at Tucumcari, New Mexico, opened April 23, 1936, shows the following:

| Name of Bidder | Price per Bbl. | Name of Bidder | Price per Bbl. |
|---|---|---|---|
| Monarch | $3.286854 | Oklahoma | $3.286854 |
| Ash Grove | 3.286854 | Consolidated | 3.286854 |
| Lehigh | 3.286854 | Trinity | 3.286854 |
| Southwestern | 3.286854 | Lone Star | 3.286854 |
| U. S. Portland Cement Co | 3.286854 | Universal | 3.286854 |
|  |  | Colorado | 3.286854 |

All bids subject to 10¢ per barrel discount for payment in 15 days. (Com. Ex. 175–A.)   See 157 F. 2d at 576.

Occasionally foreign cement has been imported, and cement dealers have sold it below the delivered price of the domestic product. Dealers who persisted in selling foreign cement were boycotted by the domestic producers. Officers of the Institute took the lead in securing pledges by producers not to permit sales f. o. b. mill to purchasers who furnished their own trucks, a practice regarded as seriously disruptive of the entire delivered price structure of the industry.

During the depression in the 1930's, slow business prompted some producers to deviate from the prices fixed by the delivered price system. Meetings were held by other producers; an effective plan was devised to punish the recalcitrants and bring them into line. The plan was simple but successful. Other producers made the recalcitrant's plant an involuntary base point. The base price was driven down with relatively insignificant losses to the producers who imposed the punitive basing point, but with heavy losses to the recalcitrant who had to make all its sales on this basis. In one instance, where a producer had made a low public bid, a punitive base point price was put on its plant and cement was reduced 10¢ per barrel; further reductions quickly followed until the base price at which this recalcitrant had to sell its cement dropped to 75¢ per barrel, scarcely one-half of its former base price of $1.45. Within six weeks after the base price hit 75¢ capitulation occurred and the recalcitrant joined a portland cement association. Cement in that locality then bounced back to $1.15, later to $1.35, and finally to $1.75.

The foregoing are but illustrations of the practices shown to have been utilized to maintain the basing point price system. Respondents offered testimony that cement is a standardized product, that "cement is cement," that no differences existed in quality or usefulness, and that purchasers demanded delivered price quotations be-

cause of the high cost of transportation from mill to dealer. There was evidence, however, that the Institute and its members had, in the interest of eliminating competition, suppressed information as to the variations in quality that sometimes exist in different cements.[16] Respondents introduced the testimony of economists to the effect that competition alone could lead to the evolution of a multiple basing point system of uniform delivered prices and terms of sale for an industry with a standardized product and with relatively high freight costs. These economists testified that for the above reasons no inferences of collusion, agreement, or understanding could be drawn from the admitted fact that cement prices of all United States producers had for many years almost invariably been the same in every given locality in the country. There was also considerable testimony by other economic experts that the multiple basing point system of delivered prices as employed by respondents contravened accepted economic principles and could only have been maintained through collusion.

The Commission did not adopt the views of the economists produced by the respondents. It decided that even though competition might tend to drive the price of standardized products to a uniform level, such a tendency alone could not account for the almost perfect identity in prices, discounts, and cement containers which had prevailed for so long a time in the cement industry. The Commission held that the uniformity and absence of competition in the industry were the results of understandings or agreements entered into or carried out by concert of the Institute and the other respondents. It

---

[16] See *Sugar Institute* v. *United States,* 297 U. S. 553, 600: "The fact that, because sugar is a standardized commodity, there is a strong tendency to uniformity of price, makes it the more important that such opportunities as may exist for fair competition should not be impaired."

may possibly be true, as respondents' economists testified, that cement producers will, without agreement express or implied and without understanding explicit or tacit, always and at all times (for such has been substantially the case here) charge for their cement precisely, to the fractional part of a penny, the price their competitors charge. Certainly it runs counter to what many people have believed, namely, that without agreement, prices will vary—that the desire to sell will sometimes be so strong that a seller will be willing to lower his prices and take his chances. We therefore hold that the Commission was not compelled to accept the views of respondents' economist-witnesses that active competition was bound to produce uniform cement prices. The Commission was authorized to find understanding, express or implied, from evidence that the industry's Institute actively worked, in cooperation with various of its members, to maintain the multiple basing point delivered price system; that this pricing system is calculated to produce, and has produced, uniform prices and terms of sale throughout the country; and that all of the respondents have sold their cement substantially in accord with the pattern required by the multiple basing point system.[17]

---

[17] It is enough to warrant a finding of a "combination" within the meaning of the Sherman Act, if there is evidence that persons, with knowledge that concerted action was contemplated and invited, give adherence to and then participate in a scheme. *Interstate Circuit* v. *United States,* 306 U. S. 208, 226–227; *United States* v. *Masonite Corp.,* 316 U. S. 265, 275; *United States* v. *Bausch & Lomb Co.,* 321 U. S. 707, 722–723; *United States* v. *U. S. Gypsum Co.,* 333 U. S. 364, 393–394. See *United States Maltsters Assn.* v. *Federal Trade Comm'n,* 152 F. 2d 161, 164: "We are of the view that the Commission's findings that a price fixing agreement existed must be accepted. Any other conclusion would do violence to common sense and the realities of the situation. The fact that petitioners utilized a system which enabled them to deliver malt at every point of destination at exactly the same price is a persuasive circumstance

Some of the respondents contend that particularly as to them crucial findings of participation by them in collective action to eliminate price competition and to bring about uniformity of cement prices are without testimonial support. On this ground they seek to have the proceedings dismissed as to them even though there may be adequate evidence to sustain the Commission's findings and order as to other respondents. The Commission rejected their contentions; the Circuit Court of Appeals did not consider them in its opinion. Those respondents whose individual contentions in this respect deserve special mention are central and southern California cement companies; Superior Portland Cement Company and Northwestern Portland Cement Company, both of the State of Washington; Huron Portland Cement Company, which does business in the Great Lakes region; and Marquette Cement Manufacturing Company with plants in Illinois and Missouri.

These companies support their separate contentions for particularized consideration by pointing out among other things that there was record evidence which showed differences between many of their sales methods and those practiced by other respondents. Each says that there was no direct evidence to connect it with all of the practices found to have been used by the Institute and other respondents to achieve delivered price uniformity.

The record does show such differences as those suggested. It is correct to say, therefore, that the sales practices of these particular respondents, and perhaps

in itself. Especially is this so when it is considered that petitioners' plants are located in four different states and that the barley from which the malt is manufactured is procured from eight or nine different states." See also *Milk & Ice Cream Can Institute* v. *Federal Trade Comm'n*, 152 F. 2d 478, 481; *Fort Howard Paper Co.* v. *Federal Trade Comm'n*, 156 F. 2d 899, 907.

of other respondents as well, were not at all times precisely like the sales practices of all or any of the others. For example, the Commission found that in 1929 all of the central California mills became basing points. There was evidence that the Institute's rate books did not extend to the states in which some of the California companies did business. The Commission found that "In southern California the basing-point system of pricing is modified by an elaborate system of zone prices applicable in certain areas," that the California system does not require separate calculations to determine the delivered price at each destination, but that complete price lists were published by the companies showing delivered prices at substantially all delivery points. Northwestern and Superior assert that among other distinctive practices of theirs, they were willing to and did bid for government contracts on a mill price rather than a delivered price basis. Huron points out that it permitted the use of trucks to deliver cement, which practice, far from being consistent with the plan of others to maintain the basing point delivered price formulas, was frowned on by the Institute and others as endangering the success of the plan. Marquette emphasizes that it did not follow all the practices used to carry out the anti-competition plan, and urges that although the Commission rightly found that it had upon occasion undercut its competitors, it erroneously found that its admitted abandonment of price cutting was due to the combined pressure of other respondents, including the Institute.

What these particular respondents emphasize does serve to underscore certain findings which show that some respondents were more active and influential in the combination than were others,[18] and that some companies

[18] For example, there was evidence which showed that Huron's officials participated in meetings held in connection with another respondent's practices deemed inimical to the policy of non-compe-

probably unwillingly abandoned competitive practices and entered into the combination. But none of the distinctions mentioned, or any other differences relied on by these particular respondents, justifies a holding that there was no substantial evidence to support the Commission's findings that they cooperated with all the others to achieve the ultimate objective of all—the elimination of price competition in the sale of cement. These respondents' special contentions only illustrate that the Commission was called upon to resolve factual issues as to each of them in the light of whatever relevant differences in their practices were shown by the evidence. For aside from the testimony indicating the differences in their individual sales practices, there was abundant evidence as to common practices of these respondents and the others on the basis of which the Commission was justified in finding cooperative conduct among all to achieve delivered price uniformity.

The evidence commonly applicable to these and the other respondents showed that all were members of the Institute and that the officers of some of these particular respondents were or had been officers of the Institute. We have already sustained findings that the Institute was organized to maintain the multiple basing point system as one of the "customs and usages" of the industry and that it participated in numerous activities intended to eliminate price competition through the collective efforts of the respondents. Evidence before the Commission also showed that the delivered prices of these respondents, like those of all the other respondents, were, with rare exceptions, identical with the delivered prices of all their competitors. Furthermore, there was evi-

---

tition. As a result of that meeting the offending company agreed that it would "play the game 100%"; that it would not countenance "chiseling"; that it would not knowingly invade territory of its competitors, or "tear down the price structure."

dence that all of these respondents, including those who sold cement on a zone basis in sections of southern California, employed the multiple basing point delivered price system on a portion of their sales.

Our conclusion is that there was evidence to support the Commission's findings that all of the respondents, including the California companies, Northwestern Portland and Superior Portland, Huron and Marquette, cooperated in carrying out the objectives of the basing point delivered price system.

*Unfair Methods of Competition.*—We sustain the Commission's holding that concerted maintenance of the basing point delivered price system is an unfair method of competition prohibited by the Federal Trade Commission Act. In so doing we give great weight to the Commission's conclusion, as this Court has done in other cases. *Federal Trade Comm'n* v. *R. F. Keppel & Bro.*, 291 U. S. 304, 314; *Federal Trade Comm'n* v. *Pacific States Paper Trade Assn.*, 273 U. S. 52, 63. In the *Keppel* case the Court called attention to the express intention of Congress to create an agency whose membership would at all times be experienced, so that its conclusions would be the result of an expertness coming from experience. We are persuaded that the Commission's long and close examination of the questions it here decided has provided it with precisely the experience that fits it for performance of its statutory duty. The kind of specialized knowledge Congress wanted its agency to have was an expertness that would fit it to stop at the threshold every unfair trade practice—that kind of practice which, if left alone, "destroys competition and establishes monopoly." *Federal Trade Comm'n* v. *Raladam Co.*, 283 U. S. 643, 647, 650. And see *Federal Trade Comm'n* v. *Raladam Co.*, 316 U. S. 149, 152.

We cannot say that the Commission is wrong in concluding that the delivered-price system as here used pro-

vides an effective instrument which, if left free for use of the respondents, would result in complete destruction of competition and the establishment of monopoly in the cement industry. That the basing point price system may lend itself to industry-wide anti-competitive practices is illustrated in the following among other cases: *United States* v. *United States Gypsum Co.,* 333 U. S. 364, *Sugar Institute* v. *United States,* 297 U. S. 553. We uphold the Commission's conclusion that the basing point delivered price system employed by respondents is an unfair trade practice which the Trade Commission may suppress.[19]

*The Price Discrimination Charge in Count Two.*—The Commission found that respondents' combination to use the multiple basing point delivered price system had effected systematic price discrimination in violation of § 2 of the Clayton Act as amended by the Robinson-Patman Act. 49 Stat. 1526, 15 U. S. C. § 13. Section 2 (a) of that Act declares it to "be unlawful for any person engaged in commerce . . . either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality . . . where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them . . . ." Section 2 (b) provides that proof of discrimination in price (selling the same kind of goods cheaper to one purchaser than to another) makes out a prima facie case of violation, but permits the seller to

---

[19] While we hold that the Commission's findings of combination were supported by evidence, that does not mean that existence of a "combination" is an indispensable ingredient of an "unfair method of competition" under the Trade Commission Act. See *Federal Trade Comm'n* v. *Beech-Nut Packing Co.,* 257 U. S. 441, 455.

rebut "the prima-facie case thus made by showing that his lower price . . . was made in good faith to meet an equally low price of a competitor . . . ."

The Commission held that the varying mill nets received by respondents on sales between customers in different localities constituted a "discrimination in price between different purchasers" within the prohibition of § 2 (a), and that the effect of this discrimination was the substantial lessening of competition between respondents. The Circuit Court of Appeals reversed the Commission on this count. It agreed that respondents' prices were unlawful insofar as they involved the collection of phantom freight, but it held that prices involving only freight absorption came within the "good faith" proviso of § 2 (b).

The respondents contend that the differences in their net returns from sales in different localities which result from use of the multiple basing point delivered price system are not price discriminations within the meaning of § 2 (a). If held that these net return differences are price discriminations prohibited by § 2 (a), they contend that the discriminations were justified under § 2 (b) because "made in good faith to meet an equally low price of a competitor." Practically all the arguments presented by respondents in support of their contentions were considered by this Court and rejected in 1945 in *Corn Products Co.* v. *Federal Trade Comm'n*, 324 U. S. 726, and in the related case of *Federal Trade Comm'n* v. *Staley Co.*, 324 U. S. 746. As stated in the *Corn Products* opinion at 730, certiorari was granted in those two cases because the "questions involved" were "of importance in the administration of the Clayton Act in view of the widespread use of basing point price systems." For this reason the questions there raised were given thorough consideration. Consequently, we see no reason for again reviewing the questions that were there decided.

In the *Corn Products* case the Court, in holding illegal a single basing point system, specifically reserved decision upon the legality under the Clayton Act of a multiple basing point price system, but only in view of the "good faith" proviso of § 2 (b), and referred at that point to the companion *Staley* opinion. 324 U. S. at 735. The latter case held that a seller could not justify the adoption of a competitor's basing point price system under § 2 (b) as a good faith attempt to meet the latter's equally low price. Thus the combined effect of the two cases was to forbid the adoption for sales purposes of any basing point pricing system. It is true that the Commission's complaint in the *Corn Products* and *Staley* cases simply charged the individual respondents with discrimination in price through use of a basing point price system, and did not, as here, allege a conspiracy or combination to use that system. But the holdings in those two cases that § 2 forbids a basing point price system are equally controlling here, where the use of such a system is found to have been the result of a combination. Respondents deny, however, that the *Corn Products* and *Staley* cases passed on the questions they here urge.

Corn Products Co. was engaged in the manufacture and sale of glucose. It had two plants, one in Chicago, one in Kansas City. Both plants sold "only at delivered prices, computed by adding to a base price at Chicago the published freight tariff from Chicago to the several points of delivery, even though deliveries are in fact made from their factory at Kansas City as well as from their Chicago factory." 324 U. S. at 729. This price system we held resulted in Corn Products Co. receiving from different purchasers different net amounts corresponding to differences in the amounts of phantom freight collected or of actual freight charges absorbed. We further held that "price discriminations are necessarily involved where

the price basing point is distant from the point of production," because in such situations prices "usually include an item of unearned or phantom freight or require the absorption of freight with the consequent variations in the seller's net factory prices. Since such freight differentials bear no relation to the actual cost of delivery, they are systematic discriminations prohibited by § 2 (a), whenever they have the defined effect upon competition." *Federal Trade Comm'n* v. *Staley, supra* at 750–751. This was a direct holding that a pricing system involving both phantom freight and freight absorption violates § 2 (a) if under that system prices are computed for products actually shipped from one locality on the fiction that they were shipped from another. This Court made the holding despite arguments, which are now repeated here, that in passing the Robinson-Patman Act, Congress manifested its purpose to sanction such pricing systems; that this Court had approved the system in *Maple Flooring Assn.* v. *United States,* 268 U. S. 563, and in *Cement Mfrs. Assn.* v. *United States,* 268 U. S. 588; and that there was no discrimination under this system between buyers at the same point of delivery.

Respondents attempt to distinguish their multiple basing point pricing system from those previously held unlawful by pointing out that in some situations their system involves neither phantom freight nor freight absorption; for example, sales by a base mill at its base price plus actual freight from the mill to the point of delivery involve neither phantom freight nor freight absorption. But the Corn Products pricing system which was condemned by this Court related to a base mill, that at Chicago, as well as to a non-base mill, at Kansas City. The Court did not permit this fact to relieve the pricing system from application of § 2, or to require any modification of the Commission's order. So here, we could

not require the Commission to attempt to distinguish between sales made by a base mill involving actual freight costs and all other sales made by both base and non-base mills, when all mills adhere to a common pricing system.

Section 2 (b) permits a single company to sell one customer at a lower price than it sells to another if the price is "made in good faith to meet an equally low price of a competitor." But this does not mean that § 2 (b) permits a seller to use a sales system which constantly results in his getting more money for like goods from some customers than he does from others. We held to the contrary in the *Staley* case. There we said that the Act "speaks only of the seller's 'lower' price and of that only to the extent that it is made 'in good faith to meet an equally low price of a competitor.' The Act thus places emphasis on individual competitive situations, rather than upon a general system of competition." *Federal Trade Comm'n* v. *Staley, supra* at 753. Each of the respondents, whether all its mills were basing points or not, sold some cement at prices determined by the basing point formula and governed by other base mills. Thus, all respondents to this extent adopted a discriminatory pricing system condemned by § 2. As this in itself was evidence of the employment of the multiple basing point system by the respondents as a practice rather than as a good faith effort to meet "individual competitive situations," we think the Federal Trade Commission correctly concluded that the use of this cement basing point system violated the Act. Nor can we discern under these circumstances any distinction between the "good faith" proviso as applied to a situation involving only phantom freight and one involving only freight absorption. Neither comes within its terms.

We hold that the Commission properly concluded that respondents' pricing system results in price discrimina-

tions. Its finding that the discriminations substantially lessened competition between respondents and that they were not made in good faith to meet a competitor's price are supported by evidence. Accordingly, the Commission was justified in issuing a cease and desist order against a continuation of the unlawful discriminatory pricing system.

*The Order.*—There are several objections to the Commission's cease and desist order. We consider the objections, having in mind that the language of its prohibitions should be clear and precise in order that they may be understood by those against whom they are directed. See *Illinois Commerce Comm'n* v. *Thomson,* 318 U. S. 675, 685. But we also have in mind that the Commission has a wide discretion generally in the choice of remedies to cope with trade problems entrusted to it by the Commission Act. *Jacob Siegel Co.* v. *Federal Trade Comm'n,* 327 U. S. 608, 611–613.

There is a special reason, however, why courts should not lightly modify the Commission's orders made in efforts to safeguard a competitive economy. Congress when it passed the Trade Commission Act felt that courts needed the assistance of men trained to combat monopolistic practices in the framing of judicial decrees in antitrust litigation. Congress envisioned a commission trained in this type of work by experience in carrying out the functions imposed upon it.[20] To this end it provided in § 7 of the Act, 15 U. S. C. § 47, that courts might, if it should be concluded that the Government was entitled to

_____

[20] In speaking of the authority granted the Commission to aid the courts in drafting antitrust decrees, the Senate Committee on Interstate Commerce said:

"These powers, partly administrative and partly quasi judicial, are of great importance and will bring both to the Attorney General and to the court the aid of special expert experience and training

a decree in an antitrust case, refer that case "to the commission, as a master in chancery, to ascertain and report an appropriate form of decree therein." The Court could then adopt or reject such a report.

In the present proceeding the Commission has exhibited the familiarity with the competitive problems before it which Congress originally anticipated the Commission would achieve from its experience. The order it has prepared is we think clear and comprehensive. At the same time the prohibitions in the order forbid no activities except those which if continued would directly aid in perpetuating the same old unlawful practices. Nor do we find merit to the charges of surplusage in the order's terms.

Most of the objections to the order appear to rest on the premise that its terms will bar an individual cement producer from selling cement at delivered prices such that its net return from one customer will be less than from another, even if the particular sale be made in good faith to meet the lower price of a competitor. The Commission disclaims that the order can possibly be so understood. Nor do we so understand it. As we read the order, all of its separate prohibiting paragraphs and sub-

---

in matters regarding which neither the Department of Justice nor the courts can be expected to be proficient.

"With the exception of the Knight case, the Supreme Court has never failed to condemn and to break up any organization formed in violation of the Sherman law which has been brought to its attention; but the decrees of the court, while declaring the law satisfactorily as to the dissolution of the combinations, have apparently failed in many instances in their accomplishment simply because the courts and the Department of Justice have lacked the expert knowledge and experience necessary to be applied to the dissolution of the combinations and the reassembling of the divided elements in harmony with the spirit of the law." Sen. Rep. No. 597, 63d Cong., 2d Sess. 12 (1914).

paragraphs, which need not here be set out, are modified and limited by a preamble. This preamble directs that all of the respondents "do forthwith cease and desist from entering into, continuing, cooperating in, or carrying out any planned common course of action, understanding, agreement, combination, or conspiracy between and among any two or more of said respondents, or between any one or more of said respondents and others not parties hereto, to do or perform any of the following things . . . ." Then follow the prohibitory sentences. It is thus apparent that the order by its terms is directed solely at concerted, not individual activity on the part of the respondents.

Respondents have objected to the phrase "planned common course of action" in the preamble. The objection is twofold; first, that it adds nothing to the words that immediately follow it; and second, that if it does add anything, "the Commission should be required to state what this novel phrase means in this order and what it adds to the four words." It seems quite clear to us what the phrase means. It is merely an emphatic statement that the Commission is prohibiting concerted action—planned concerted action. The Commission chose a phrase perhaps more readily understood by businessmen than the accompanying legal words of like import.

Then there is objection to that phrase in the preamble which would prevent respondents, or any of them, from doing the prohibited things with "others not parties hereto." We see no merit in this objection. The Commission has found that the cement producers have from time to time secured the aid of others outside the industry who are not parties to this proceeding in carrying out their program for preserving the basing point pricing system as an instrument to suppress competition. Moreover, there will very likely be changes in the present

ownership of cement mills, and the construction of new mills in the future may be reasonably anticipated. In view of these facts, the Commission was authorized to make its order broad enough effectively to restrain respondents from combining with others as well as among themselves.

One other specific objection to the order will be noted. Paragraph 1 prohibits respondents from "quoting or selling cement pursuant to or in accordance with any other plan or system which results in identical price quotations or prices for cement at points of quotation or sale or to particular purchasers by respondents using such plan or system, or which prevents purchasers from finding any advantage in price in dealing with one or more of the respondents against any of the other respondents." This paragraph like all the others in the order is limited by the preamble which refers to concerted conduct in accordance with agreement or planned common course of action. The paragraph is merely designed to forbid respondents from acting in harmony to bring about national uniformity in whatever fashion they may seek by collective action to achieve that result. We think that no one would find ambiguity in this language who concluded in good faith to abandon the old practices. There is little difference in effect between paragraph 1 to which objection is here raised and paragraph 5 which was sustained as proper in *Federal Trade Comm'n* v. *Beech-Nut Pkg. Co.*, 257 U. S. 441, 456 (1922), one of the first Trade Commission cases to come before this Court. Paragraph 5 in the *Beech-Nut* case read: ". . . by utilizing any other equivalent cooperative means of accomplishing the maintenance of prices fixed by the company."

Many other arguments have been presented by respondents. All have been examined, but we find them without merit.

The Commission's order should not have been set aside by the Circuit Court of Appeals. Its judgment is reversed and the cause is remanded to that court with directions to enforce the order.

*It is so ordered.*

MR. JUSTICE DOUGLAS and MR. JUSTICE JACKSON took no part in the consideration or decision of these cases.

MR. JUSTICE BURTON, dissenting.

While this dissent is written with special reference to case No. 23 against The Cement Institute, et al., its conclusions apply to cases Nos. 23–34, all of which were considered together.

It is important to note that this Court has disagreed with the conclusions of the court below as to the material facts constituting the premise on which that court and this have based their respective conclusions. Accordingly, this Court has neither reversed nor directly passed upon the principal conclusion of law reached by the court below. The court below concluded that there was not sufficient evidence to support a finding by the Federal Trade Commission of the existence of that combination among the respondents to restrain the competition in price that was charged in both counts of the complaint.[1]

---

[1] ". . . For more than eight years last past, respondents have maintained and now have in effect a combination among themselves to hinder, lessen, restrict and restrain competition in price, among producing respondents in the course of their aforesaid commerce among the states. The said combination is made effective by mutual understanding or agreement to employ, and by the actual employment of, the methods and practices set forth in Paragraphs Five to Seven inclusive, of this Count." Count I, Paragraph Four, of complaint.

". . . As Paragraphs One to Five, inclusive, of Count II of this complaint the Commission hereby incorporates Paragraphs One to Five, inclusive, of Count I to precisely the same extent as if each and all of them were set forth in full and repeated verbatim in this Count." Count II, Paragraphs One to Five, inclusive, of complaint. 37 F. T. C. at pp. 102, 117.

The court below even doubted that the Commission had clearly stated that it found such a combination existed. However, rather than send the case back to the Commission for clarification of the Commission's findings of fact, the Court of Appeals assumed that those findings did state that such a combination existed. The court then concluded that, even if the Commission had so found, there was not sufficient evidence to support the finding.[2] Accordingly, the court below applied the law of the case to a set of facts that did not include such a combination. On that basis, it held that the Commission's order to cease and desist should be set aside. I agree with the court below in both of these conclusions.[3] On the other hand, this Court today has held not only

---

[2] The Court of Appeals considered it a "highly controverted issue" as to whether the findings as made by the Commission, even if supported by sufficient evidence in the record, would "sustain the charge of combination alleged in the complaint." 157 F. 2d 533, 543. That court then said that if—

"this were an ordinary proceeding we would return it to the Commission for the purpose of revising its findings if it could and so desired in the light of what we have said. However, we are confronted with what might be termed an extraordinary situation. As already observed, it will soon be ten years since this proceeding was initiated. . . . We think the case should be on its way up and not down. For this reason we shall not return it to the Commission but shall proceed to decide the legal issues involved." *Id.* at p. 553.

[3] The law of the case represents a development of the law in relation to delivered-price systems. See especially, *Federal Trade Comm'n v. Staley Mfg. Co.*, 324 U. S. 746; *Corn Products Refining Co. v. Federal Trade Comm'n*, 324 U. S. 726; *Sugar Institute, Inc. v. United States*, 297 U. S. 553; *Fairmont Creamery Co. v. Minnesota*, 274 U. S. 1; *Cement Mfrs. Protective Assn. v. United States*, 268 U. S. 588; *Maple Flooring Manufacturers Assn. v. United States*, 268 U. S. 563; *United States v. American Linseed Oil Co.*, 262 U. S. 371; *Aetna Portland Cement Co. v. Federal Trade Comm'n*, 157 F. 2d 533 (C. C. A. 7th) (this case below); *Fort Howard Paper Co. v. Federal Trade Comm'n*, 156 F. 2d 899 (C. C. A. 7th); *United States Maltsters Assn. v. Federal Trade Comm'n*, 152 F. 2d 161 (C. C. A. 7th).

that the Commission found the existence of the combination as charged, but that such finding is sufficiently supported by evidence in the record. This Court accordingly has applied the law of the case to a set of facts which includes a combination among the respondents to restrain competition in price as alleged in the complaint. The resulting effect is that, while the court below has held that without such a combination there was not the alleged violation either of § 5 of the Federal Trade Commission Act[4] or of § 2 of the amended Clayton Act,[5] yet on the other hand, this Court has held that, in-

---

[4] "Sec. 5. (a) Unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce, are hereby declared unlawful.

"The Commission is hereby empowered and directed to prevent persons, partnerships, or corporations, . . . from using unfair methods of competition in commerce and unfair or deceptive acts or practices in commerce.

"(b) Whenever the Commission shall have reason to believe that any such person, partnership, or corporation has been or is using any unfair method of competition or unfair or deceptive act or practice in commerce, and if it shall appear to the Commission that a proceeding by it in respect thereof would be to the interest of the public, it shall issue and serve upon such person, partnership, or corporation a complaint stating its charges in that respect and containing a notice of a hearing upon a day and at a place therein fixed . . . . If upon such hearing the Commission shall be of the opinion that the method of competition or the act or practice in question is prohibited by this Act, it shall make a report in writing in which it shall state its findings as to the facts and shall issue and cause to be served on such person, partnership, or corporation an order requiring such person, partnership, or corporation to cease and desist from using such method of competition or such act or practice. . . ."

52 Stat. 111–112, 15 U. S. C. § 45.

[5] Sec. 2. (a) . . . it shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, . . . where the effect of such dis-

cluding such a combination, there was a violation of each of those Sections to the extent charged in the several cases. This Court, therefore, has not here determined the relation, if any, of either of the foregoing statutes to the absorption of freight charges by individuals when not participating in a combination of the kind charged by the Commission.[6]

---

crimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them: *Provided,* That nothing herein contained shall prevent differentials which make only due allowance for differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered: . . . .

"(b) Upon proof being made, at any hearing on a complaint under this section, that there has been discrimination in price or services or facilities furnished, the burden of rebutting the prima-facie case thus made by showing justification shall be upon the person charged with a violation of this section, and unless justification shall be affirmatively shown, the Commission is authorized to issue an order terminating the discrimination: *Provided, however,* That nothing herein contained shall prevent a seller rebutting the prima-facie case thus made by showing that his lower price or the furnishing of services or facilities to any purchaser or purchasers was made in good faith to meet an equally low price of a competitor, or the services or facilities furnished by a competitor."

.        .        .        .        .

49 Stat. 1526, 15 U. S. C. § 13.

[6] The final section of the opinion of the Court makes appropriate disclaimers as to the breadth of the Commission's order and of its own decision sustaining that order. Among these is the statement that "the order by its terms is directed solely at concerted, not individual activity on the part of the respondents." These disclaimers are further supported by such statements as the following in the brief filed for the Commission in this Court:

"It is plain that under this order there is a violation of its provisions only in the event that there is a 'planned common course of

The Commission based its conclusion upon its finding of the existence of the combination charged in its com-

---

action, understanding, agreement, combination, or conspiracy' to which a respondent is a party to do something specified in the numbered paragraphs of the order. This is an essential qualification of the prohibitions of these paragraphs. The order therefore leaves each respondent free—provided he acts individually and with that variability in action respecting particular competitive situations which is characteristic of genuine competitive endeavor and a free market—to absorb freight in order to meet a competitor's low price or to sell at a delivered price.

"What the order does is to bar acting in concert in adopting, continuing, or implementing the multiple basing-point delivered-price system or any similar system which necessarily operates to suppress price competition. The order is aimed at uprooting the pricing system which has flourished by virtue of the agreement among respondents, charged and found, to stifle price competition by selling cement at identical prices.

"The error of the court below is epitomized in its statement that 'this court is now urged to hold that the [multiple basing-point delivered-price] system is illegal *per se,* and to require that cement be sold on an f. o. b. plant basis' . . . . The system as such was not attacked; what was attacked was agreement to maintain and implement the system and to eliminate price competition.

". . . Had the Commission inferred agreement from the system alone, it might loosely be said that the system itself was attacked as illegal *per se.* But this is not what the Commission did. Its searching inquiry disclosed in specific detail the collective action which had been taken to implement and continue the system. And from all these facts, as well as the existence of the system itself, the Commission found combination among respondents to suppress price competition."

The statement by this Court, in its note 19, to the effect that the Court does not hold "that existence of a 'combination' is an indispensable ingredient of an 'unfair method of competition' under the Trade Commission Act" is accompanied by a citation which shows that that statement is one of general application and that it is not intended as a denial that the combination found by the Commission in this case is not a highly material and possibly decisive factor in this particular case.

plaint.[7] The court below was in a position to, and did, judicially examine the record at length, hear extended argument upon it and pass upon the many inferences to be drawn from the evidence it contained. In the light of that court's recent experience with many cases in this particular field of the law, and of what it has described as its "long and careful study of the situation," it concluded that the evidence was not sufficient to support a finding of the combination charged. Its opinion reviewed the evidence and pointed out many weaknesses in the inferences upon which the Commission had based its

---

[7] See Paragraph Twenty-six of the Commission's "Findings as to Facts and Conclusion":

". . . The Commission concludes from the evidence of record and therefore finds that the capacity, tendency, and effect of the combination maintained by the respondents herein in the manner aforesaid and the acts and practices performed thereunder and in connection therewith by said respondents, as set out herein, has been and is to hinder, lessen, restrain, and suppress competition in the sale and distribution of cement in, among, and between the several States of the United States; to deprive purchasers of cement, both private and governmental, of the benefits of competition in price; to systematically maintain artificial and monopolistic methods and prices in the sale and distribution of cement, including common rate factors used and useful in the pricing of cement; . . . ." 37 F. T. C. at p. 257.

The Commission followed this Paragraph Twenty-six immediately with the following conclusion of law:

"The aforesaid combination and acts and practices of respondents pursuant thereto and in connection therewith, as hereinabove found, under the conditions and circumstances set forth, constitute unfair methods of competition in commerce within the intent and meaning of the Federal Trade Commission Act; and the discriminations in price by respondents, as hereinabove set out, constitute violations of subsection (a) of Section 2 of an act of Congress entitled 'An act to supplement existing laws against unlawful restraints and monopolies, and for other purposes,' approved October 15, 1914 (the Clayton Act), as amended by act approved June 19, 1936 (the Robinson-Patman Act)." *Id.* at p. 258.

finding of the existence of the alleged unlawful combination.[8]

The absence of sufficient evidence to support the conclusions of the Commission was especially impressive in the cases concerning the central California group, the southern California group, the Washington-Oregon group [9] and the Huron Portland Cement Company. The

---

[8] A further review of the insufficiently supported inferences would be of little value here. By way of illustration, however, it may be noted that the Commission and this Court, in its note 15, have emphasized the fact that secret sealed bids for 6,000 barrels of cement were received by a public agency from ten or more of the respondent companies and that the bid of each company was precisely $3.286854 a barrel. Such a fractional identity of price would, on its face, create an inference of collusion. However, the Commission failed to explain, as has the court below, that the highly fractional figure merely reflected the freight charge. The bid, apart from the freight charge, was $2.10 per barrel while "the land grant freight rate to which the government was entitled from the nearest mill of the eleven bidders was $1.1865854 [$1.186854] per barrel." *Aetna Portland Cement Co.* v. *Federal Trade Comm'n,* 157 F. 2d 533, 567.

[9] The central California group refers to the following respondents:
Calaveras Cement Company,
Pacific Portland Cement Company,
Santa Cruz Portland Cement Company,
Yosemite Portland Cement Corporation.

The southern California group to:
California Portland Cement Company,
Monolith Portland Cement Company,
Riverside Cement Company,
Southwestern Portland Cement Company (Victorville, California, plant).

The Washington-Oregon group to:
Beaver Portland Cement Company,
Lehigh Portland Cement Company (Metaline Falls, Washington, plant),
Northwestern Portland Cement Company,
Oregon Portland Cement Company,
Spokane Portland Cement Company,
Superior Portland Cement, Inc.

decision of the Commission and of this Court even in those cases was made dependent upon the conclusion of the existence of a combination, however attenuated the basis for that conclusion might be.[10] The cease and desist orders in all of these cases are therefore to be regarded as based upon the unique and extended record presented in this case, including what this Court refers to as "abundant evidence as to common practices of these respondents and the others on the basis of which the Commission was justified in finding cooperative conduct among all to achieve delivered price uniformity."

On the view of the evidence taken by the court below and by me, that evidence does not support the Commission's finding of the combination as charged. Unlike the Commission and the majority of this Court, the lower court and I, therefore, have faced the further issue presented by the Commission's charges unsupported by a finding of the alleged combination. This has led us to consider an issue quite different from that decided by this Court today. That issue lies within the long-established and widespread practice by individuals of bona fide competition by freight absorption with which practice Congress has declined to interfere, although asked

[10] In a general finding the Commission indicated that the evidence concerning certain of the respondent companies was less conclusive than that relating to some of the other respondents.

"Some of the respondents have been parties to substantially all of these activities; other respondents have participated in a lesser degree, or fully or partially for shorter periods of time; other respondents have been mere followers, adopting and supporting the practices of their more active associates; and a few respondents have from time to time, for various reasons, participated only reluctantly in some of the practices, and have occasionally opposed for a time particular instances of group action." Commission's "Findings as to Facts and Conclusion," Paragraph Six (a). 37 F. T. C. at p. 144.

to do so.[11]  This is the field where a producer, for his own purposes and without collusion, often ships his product to a customer who, in terms of freight charges, is

---

[11] "Furthermore, the basing point price system has been in use by industry for almost a half century.  There has been and is a marked diversity of opinion among economists, lawmakers and people generally as to whether it is good or bad.  Numerous bills have been introduced in Congress seeking to outlaw its use.  Countless time has been spent in hearings by Congressional committees, before whom it has been assailed and defended.  The pages of the Congressional Record bear mute but indisputable proof of the fact that Congress has repeatedly refused to declare its use illegal.  There is no occasion to relate this Congressional history.  It is a matter of common and general knowledge.  In the Corn Products case, the court in commenting upon some of this legislative history stated (324 U. S. at page 737, 65 S. Ct. at page 967, 89 L. Ed. 1320): 'We think this legislative history indicates only that Congress was unwilling to require f. o. b. factory pricing, and thus to make all uniform delivered price systems and all basing point systems illegal per se.'  Notwithstanding this Congressional attitude as recognized by the Supreme Court, this court is now urged to hold that the system is illegal per se, and to require that cement be sold on an f. o. b. plant basis.

"In our judgment, the question as to whether the basing point price system should be declared illegal rests clearly within the legislative domain.  We know of no criticism so often and so forcibly directed at courts, particularly Federal courts, as their propensity for usurping the functions of Congress.  If this pricing system which Congress has over the years steadfastly refused to declare illegal, although vigorously urged to do so, is now to be outlawed by the courts, it will mark the high tide in judicial usurpation."  *Aetna Portland Cement Co.* v. *Federal Trade Comm'n, supra, at* p. 573.

See §§ 1 and 2, Sherman Antitrust Act, approved July 2, 1890, 26 Stat. 209, 15 U. S. C. §§ 1 and 2; § 5, Federal Trade Commission Act, approved September 26, 1914, 38 Stat. 719; § 2, Clayton Act, approved October 15, 1914, 38 Stat. 730; § 2, Clayton Act, as amended by the Robinson-Patman Act, approved June 19, 1936, 49 Stat. 1526, 15 U. S. C. § 13; § 5, Federal Trade Commission Act, as amended, March 21, 1938, 52 Stat. 111, 15 U. S. C. § 45.  See Bill "To Prevent Unnecessary and Wasteful Cross-Hauling" introduced by Senator Wheeler in 1936 banning basing-point systems by statute, but not reported out of Committee.  Hearings before Senate Committee on

located nearer to one or more of the producer's competitors than to the producer himself. In selling to such a customer, this producer is at an obvious freight disadvantage. To meet the lower delivered-price of his competitor, the producer, therefore, reduces his delivered-price in that area by a sum sufficient to absorb his freight disadvantage. He might do this for many reasons. For example, this customer might be such a large customer that the volume of his orders would yield such a return to the producer that the producer, by distributing his fixed charges over the resultingly increased volume of business, could absorb the freight differential without loss of profit to his business as a whole and without raising any charges to his other customers. The securing of this particular business might even enable the producer to reduce his own basic factory price to all his customers. It might make the difference between a profitable and a losing business, resulting in the producer's solvency or bankruptcy. If the advantage to be derived from this customer's business were not sufficient, in itself, thus completely to absorb the freight differential, the producer might absorb all or part of such differential by a reduction in his net earnings without affecting his other customers. Whether or not he would be justified in absorbing any or all of this freight differential by increasing his charges to other customers, in his own freight-advantage area, raises a separate question as to the validity of such an increase. The Commission and the majority of this Court did not reach the question of individual and independent absorptions of freight charges by one or more producers to meet lower prices of competitors in such competitors' respective areas of freight advantage.

Interstate Commerce on S. 4055, 74th Cong., 2d Sess. (1936), and see p. 325. See also, H. R. Rep. No. 2287, 74th Cong., 2d Sess. 14 (1936), and debates upon the Robinson-Patman Bill, 80 Cong. Rec. 8102, 8118, 8140, 8223–8224 (1936).

I conclude, therefore, that the judgment of the Court of Appeals setting aside the order of the Federal Trade Commission should have been affirmed, but I emphasize what I regard as equally important—that this Court, in sustaining the order of the Commission, has done so on such a different premise that it has not passed upon the validity of freight absorptions made in sales by one or more producers in the course of bona fide competition, where such producers have not acted as part of a combination to hinder, lessen, restrain or suppress competition in the sale or distribution of the products so sold.