**Ralph WALLS, Plaintiff,**

v.

**CITY OF MILFORD, a municipal corporation of the State of Delaware, and Michael T. Booker, individually and in his capacity as an employee of the City of Milford, Defendants.**

Civil Action No. 95–522 MMS.

United States District Court,
D. Delaware.

Aug. 22, 1996.

Scott E. Chambers of Schmittinger & Rodriguez, P.A., Dover, DE, for plaintiffs.

James A. Fuqua, Jr. of Fuqua and Yori, P.A., Georgetown, DE, for defendants.

## OPINION

MURRAY M. SCHWARTZ, Senior District Judge.

### I. Introduction

Plaintiff Ralph Walls ("Walls" or "plaintiff") has moved for summary judgment against defendants Michael T. Booker ("Booker") and the City of Milford ("Milford") (collectively, "defendants") on claims arising under 42 U.S.C. § 1983. The gravamen of plaintiff's complaint is that he was denied due process in connection with his suspension and termination from his employment with Milford. Plaintiff seeks nominal, compensatory and punitive damages, as well as injunctive relief. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343. For the reasons set forth below, plaintiff's motion for summary judgment will be denied.

### II. Factual Background

On plaintiff's motion for summary judgment, the facts will be recited in the light most favorable to the defendants. *Bixler v. Central Pa. Teamsters Health and Welfare Fund,* 12 F.3d 1292, 1297 (3d Cir.1993). The facts, however, are substantially undisputed. Walls is a Delaware citizen who was employed full-time as a lineman first class by Milford. Docket Item ("D.I.") 1, ¶¶ 1, 6. Booker is the City Manager of Milford. *Id.* ¶ 2. Milford is a municipal corporation, organized and existing under the laws of the State of Delaware. *Id.* ¶ 3. On March 24, 1995, Booker received an anonymous telephone call stating that a Milford truck had been parked at Walls' home earlier that day, and wire from that truck was unloaded into Walls' garage, and was then being loaded from Walls' garage into another truck. D.I. 14 at 2. The caller also indicated that this was not the first occurrence of this nature. *Id.* In response to this call, Booker contacted Chief of Police Richard Carmean ("Carmean") and related to him the substance of the call. D.I. 15 at A–1–2. Carmean sent Kenneth Brown ("Brown"), a Milford Detective, to Walls' home to investigate the matter. D.I. 15 at A–2.

Upon arrival at Walls' home, Brown noticed three men in the driveway. D.I. 15 at Exhibit ("Exh.") B, ¶ 3 (Affidavit of Brown). One of the men, spotting the police vehicle, fled behind the garage. *Id.* Brown recognized this person as Donald Carey ("Carey"), the Superintendent of the Milford Electric

Department, and Walls' supervisor. *Id.* Brown spoke with Walls, and observed him to be nervous, and noticed that Walls had trouble talking and breathing. *Id.* ¶ 4. Walls denied that Carey had been there and stated that he had not seen Carey all day. *Id.* ¶ 5. Brown observed that Walls' truck was fully loaded with wire. *Id.* ¶ 6. Walls stated that a friend had given him the wire, and that it was being unloaded and placed in his garage. *Id.*

Walls then stated he wanted to speak with Booker. *Id.* ¶ 7. Brown suggested that they telephone Booker from Walls' home, but Walls told Brown he did not have a telephone. *Id.* ¶ 7. Brown then drove Walls to the Milford City Hall to speak with Booker. *Id.* ¶ 8. On the way to Milford City Hall, Walls gave a conflicting account regarding the wire: he stated he had been loading the wire from the garage to the truck. When Brown stated that this story was different from the story he previously related, Walls denied the previous account. *Id.*

When Walls arrived at the Milford City Hall, he told Booker that the wire in question was not city property and maintained his innocence. D.I. 15 at A–3. On the following Monday, Booker met with Walls for a second time. Walls again indicated that the wire was not city property and asserted that there was no wrongdoing. *Id.* at A–4. The next day, Tuesday, Booker met with Walls for a third time. Booker asked Walls if there was anything Walls could tell him which would "sway [Booker] from proceeding further with this incident and making it part of the grievance procedure." *Id.* at A–5. Walls again stated that the wire was not city property. *Id.* At no time, however, was a formal hearing held regarding the allegations against Walls.

On March 27, 1995, Booker suspended plaintiff's employment, with pay, pending a police investigation of the allegation that plaintiff was involved in the theft of the wire belonging to Milford. D.I. 1, ¶ 7. Plaintiff received notice in the form of a letter, which stated: "Effectively immediately you are hereby suspended with pay pending a police investigation of allegations regarding the theft of City property and your role in that

theft. Should these allegations be found to be true, you will be dismissed immediately due to the serious nature of the alleged offense." D.I. 12 at Exh. C. Plaintiff was also informed in the letter that he had the right to appeal Booker's decision under Section 890 of the Grievance Policy of Milford's Personnel Ordinance (the "Grievance Policy"). *Id.* At some point subsequent to that date, but before April 12, 1995, Brown submitted a written police report to Booker containing the results of his investigation. On April 12, 1995, Booker notified Walls by letter that his employment was terminated effective that same day. *Id.* ¶ 8. The letter stated: "Due to the results of the City's investigation into allegations surrounding the theft of City property by you, I believe there is sufficient cause for your dismissal." D.I. 12 at Exh. D.

Plaintiff's rights to grieve his termination are set forth in the Grievance Policy. *See* D.I. 12 at Exh. E. There are four steps in the procedure. Under Step I, the grieving employee shall contact his immediate supervisor for a discussion of the grievance. The supervisor shall respond to the employee within two days. If the grievance is not resolved, Step II provides that the employee may request a hearing by his Department Head. The Department Head and the employee's immediate supervisor will meet with the employee within a prescribed period of time, at which meeting plaintiff may have a representative present on his behalf. The Department Head shall issue a decision to the employee within five days.

Step III allows the employee to file a written request with the City Manager for a hearing before a Hearing Panel. The Hearing Panel shall be comprised of three Milford employees appointed by the City Manager or the Chief of Police. None of the Hearing Panel members shall have been involved in any earlier phase of the grievance. The Hearing Panel shall respond within three days after the hearing by issuing a written report to the City Manager containing its findings and recommendations. Under Step IV, the City Manager shall, within five days after receiving the Hearing Panel's report, grant a hearing to the employee. After the

hearing, the City Manager shall reply to the employee in writing. That determination is final and binding.

On April 17, 1995, in response to plaintiff's request for a grievance hearing under Step III of the Grievance Policy, Booker notified plaintiff that a three-member panel would be appointed by the Chief of Police to hear the appeal. D.I. 1, ¶ 9. Steps I and II, which respectively provide for intermediate review by the employee's direct supervisor and Department Head, were bypassed in Walls' case because Carey, Walls' supervisor and the Department Head of the Electric Department, who would have held the meetings under Steps I and II, had resigned after being implicated in the theft. The Step III hearing was held on May 24, 1995, at which both plaintiff and Brown testified. *Id.* ¶ 10. On May 31, 1995, plaintiff was notified by Booker that the panel had unanimously recommended that his termination be upheld. *Id.* On June 8, 1995, plaintiff informed Booker that he wished to appeal this determination as authorized by the Grievance Policy. *Id.* ¶ 11. Under Step IV of the Grievance Policy, a hearing was to be held before the City Manager, which, in this case, was Booker. *Id.* ¶ 12. Plaintiff objected to Booker's participation in the hearing, as Booker was the person who initially suspended and terminated plaintiff's employment. *Id.* Notwithstanding the objection, Booker held the hearing on July 6, 1995, and on July 17, 1995, issued a final decision terminating plaintiff's employment with Milford. *Id.* ¶¶ 13, 14.

Plaintiff raises three claims in his action. First, he alleges that the decision to terminate plaintiff's employment with Milford was arbitrary and capricious, in that it was not supported by the evidence presented through the grievance procedure. *Id.* ¶ 15. Second, plaintiff alleges that Booker and Milford denied plaintiff procedural and substantive due process by terminating him before any process was given him, in violation of the Fourteenth Amendment to the United States Constitution, the Constitution of the State of Delaware, and the Grievance Policy. *Id.* ¶ 17. Third, plaintiff argues that Booker and Milford denied him procedural and substan-

tive due process by allowing Booker to act as the presiding officer over the final appeal, and to the extent that Booker literally complied with the Grievance Policy, that the Grievance Policy is constitutionally defective on its face. *Id.* ¶ 19. Plaintiff seeks damages, including back pay to April 12, 1995, and an injunction directing Milford to reinstate his employment as lineman first class with Milford. *Id.* ¶ 20. Plaintiff has moved for summary judgment on his claims. D.I. 10.

### III. Analysis

#### A. *Walls' Constitutionally Protected Property Interest*

■ In order to allege a due process violation in connection with termination from employment, plaintiff must establish that he has a constitutionally protected property interest in his continued employment with Milford. Constitutionally protected property interests are created and defined by an independent source, such as state law. *Board of Regents v. Roth,* 408 U.S. 564, 567, 92 S.Ct. 2701, 2704, 33 L.Ed.2d 548 (1972); *Brown v. Trench,* 787 F.2d 167, 170 (3d Cir.1986). Public employees who can only be terminated for cause have been deemed to possess constitutionally protected property interests in their continued employment. *Richardson v. Felix,* 856 F.2d 505, 509 (3d Cir.1988); *Brown,* 787 F.2d at 171 ("We conclude, therefore, that the County's just cause provision did give Brown a property right."); *Dixon v. Mayor and Council of Wilmington,* 514 F.Supp. 250, 253 (D.Del.1981) ("This Court has consistently held that public employees have a property interest if the employer has set out guidelines as to grounds for discharge.").

Here, Section 810 of the Milford Personnel Ordinance provides a nonexhaustive list of unacceptable workplace behavior which might result in disciplinary action, including suspension or termination of employment. D.I. 15 at Exh. C. Sanctionable behavior includes such conduct as theft of property, falsification of timekeeping records, and working under the influence of alcohol or illegal drugs. *Id.* Section 810 of the Milford Personnel Ordinance, therefore, creates the right of its employees to retain their employment, unless cause exists for suspension or

dismissal, and thus plainly creates a constitutionally protected property interest in continued employment.

### B. Due Process in Pre–Termination Period

■ A public employee with a constitutionally protected property interest in his continued employment cannot be denied this interest without substantive and procedural due process. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494 (1985). An essential principle of due process is that "a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *Id.* at 542, 105 S.Ct. at 1493 (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313, 70 S.Ct. 652, 656–57, 94 L.Ed. 865 (1950)). Due process fundamentally requires that the individual be given an opportunity for a hearing *before* he is deprived of his property interest. *Id.* This principle requires "some kind of hearing" prior to discharge. *Id.*

> The essential requirements of due process ... are notice and an opportunity to respond. The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement. The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story. To require more than this prior to termination would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee.

*Id.* at 546, 105 S.Ct. at 1495 (citations omitted). The purpose of the hearing is to provide an initial check against mistaken decisions and a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action. *Id.* at 545–56, 105 S.Ct. at 1495. It need not be elaborate, and it can vary, depending on the importance of the interests involved and the nature of the subsequent proceedings. *Id.* at 545, 105 S.Ct. at 1495.

The Third Circuit Court of Appeals has further explored the concept of due process in connection with pre-termination hearings. In *McDaniels v. Flick*, 59 F.3d 446 (3d Cir. 1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 1017, 134 L.Ed.2d 97 (1996), the court found that the discharged public employee, a university professor, was not denied due process upon termination because he was given notice of the charges, an adequate explanation of the evidence, and an adequate opportunity to present his side of the story. *Id.* at 456. The court observed that notice of the charges may be given at the meeting itself, and notice may be oral. *Id.* at 454; *Copeland v. Philadelphia Police Dept.*, 840 F.2d 1139, 1145 (3d Cir.1988) ("[t]he due process clause can be satisfied by oral notice."), *cert. denied*, 490 U.S. 1004, 109 S.Ct. 1636, 104 L.Ed.2d 153 (1989). The court further observed that the employee need not be informed of all the evidence, but must be given a meaningful opportunity to respond in the sense that he must know the substance of the case the employer has against him. *Id.* "We have held, however, that pre-termination notice of the charges and evidence against an employee need not be in great detail as long as it allows the employee 'the opportunity to determine what facts, if any, within his knowledge might be presented in mitigation of or in denial of the charges.'" *Id.* at 457 (quoting *Gniotek v. City of Phila.*, 808 F.2d 241, 244 (3d Cir.1986), *cert. denied*, 481 U.S. 1050, 107 S.Ct. 2183, 95 L.Ed.2d 839 (1987)); *see also Copeland*, 840 F.2d at 1145 ("Although it might have been desirable for the city to have advised him of the specific test results appearing in the report, we cannot say that failure of the city to provide such information amounted to a constitutional violation under these circumstances.") (footnote omitted); *Edmundson v. Borough of Kennett Square*, 4 F.3d 186, 193 (3d Cir.1993) (employee's pre-termination due process rights satisfied by meeting with mayor and members of city council, at which specific charges forming basis for his dismissal were explained, and opportunity for employee to explain his behavior was given).

■ Accepting defendants' version of the facts as true, as it must, the Court concludes

that Walls was given both notice of the charges and an adequate opportunity to present his side of the story. With respect to notice, there is no question that Walls had notice of the charges against him. Three meetings were held with Walls before he was terminated. The record indicates that at all three meetings, Walls was told by Booker of the nature of the investigation.

> Counsel for Plaintiff: But you stated that you did have three meetings with Mr. Walls where you had discussed with him—
> Booker: Yes. On the Friday when the incident occurred, on the Monday following the occurrence of the incident, and on that Tuesday following the Monday.
> Q. In those discussions had you notified Mr. Walls as to what was being investigated?
> A. Yes, I did.

D.I. 15 at A–9. Further, at Brown's initial arrival at Walls' residence, in the police vehicle on the way to the Milford City Hall, and again at each meeting with Booker, Walls repeatedly stated that the wire was from another source, and not city property. These assertions of innocence indicate that Walls was aware that he was suspected of stealing the wire, and therefore demonstrate that the due process notice requirement was satisfied.

■ With respect to opportunity to present his side of the story, the record indicates that Walls had three meaningful opportunities to present his version of the facts. At all three meetings, Walls had the opportunity to persuade Booker that he did not, in fact, steal property belonging to Milford.

> Counsel for Plaintiff: In those discussions had you notified Mr. Walls as to what was being investigated?
> Booker: Yes, I did.
> Q. Did he have an opportunity to present any further information to you to assist you in making your decision?
> A. Yes, he did, if that information had been available.
> Q. Did you ask him for any additional information that he had?
> A. Yes, I did. At that particular time the information that I had available to me, and

Mr. Walls' personnel record, I had really hoped that he would produce something that would convince me otherwise.

D.I. 15 at A–9–10. Booker also stated that at both the second and third meetings, he asked Walls whether Walls could give him any reason to not continue with the investigation, or if Walls had any information which would "make [Booker] not want to pursue this matter any further and ultimately prove it was not City of Milford property." D.I. 15 at A–6. Accordingly, the Court concludes that Walls had not one, but three opportunities to present his version of the facts, opportunities which he exercised by denying that the wire in question was city property and maintaining his innocence. *See Fraternal Order of Police Lodge No. 5 v. Tucker,* 868 F.2d 74, 79 (3d Cir.1989) ("The pretermination hearing may be informal so long as it affords the employee an opportunity to made any 'plausible arguments that might … prevent [the] discharge.'") (quoting *Loudermill,* 470 U.S. at 544, 105 S.Ct. at 1494).

■ Plaintiff argues that meaningful notice and opportunity to respond were denied him because the specific findings of Brown's investigation were not made known to plaintiff. D.I. 16 at 3–4. The failure to explain the specific factual bases for the allegations, plaintiff urges, constitutes a denial of due process. The Court disagrees. The Third Circuit Court of Appeals has held that only the substance of the allegations and the case against the employee need be explained in order to satisfy the minimum requirements of due process. In *McDaniels,* 59 F.3d at 457, the plaintiff had argued that "he did not receive adequate notice and explanation of the charges against him because he was not told or given the exact allegations made" against him. The court rejected this argument:

> In this regard, it is not disputed that the written summary of [the] allegations was not given or read to McDaniels before his termination. We have held, however, that pretermination notice of the charges and evidence against an employee need not be in great detail as long as it allows the employee "the opportunity to determine what facts, if any, within his knowledge

might be presented in mitigation of or in denial of the charges."

*Id.* (quoting *Gniotek,* 808 F.2d at 244) (citing *Derstein v. Kansas,* 915 F.2d 1410, 1413 (10th Cir.1990) (fact that employee did not know of all relevant facts and was not given a copy of investigation transcript is insignificant), *cert. denied sub nom. Derstein v. Benson,* 499 U.S. 937, 111 S.Ct. 1391, 113 L.Ed.2d 447 (1991)).

In sum, the Court finds that Walls had both notice and opportunity to respond to the charges against him in the pre-termination period as required by the Due Process Clause. Plaintiff's motion for summary judgment on the ground that Milford's pre-termination procedures were constitutionally deficient will be denied.

## C. Due Process in Post–Termination Period

Plaintiff alternatively argues that he was denied post-termination due process because Booker, who had initially made the decision to suspend and terminate Walls, also presided over the final appeal. Plaintiff argues that he was denied the right to an impartial decisionmaker because Booker had "substantial pre-hearing familiarity" with the facts of the case, which precluded his ability to rule on those facts. D.I. 11 at 9. In support of his position, plaintiff relies heavily on *King v. Caesar Rodney Sch. Dist.,* 380 F.Supp. 1112, 1119 (D.Del.1974). There, the District of Delaware fashioned a rule that substantial pre-hearing familiarity with the facts of the case disqualifies the decisionmakers from ruling on those facts. In that case, the Board of Education had examined all the evidence concerning the employee/teacher's performance and made the initial determination of "just cause" for dismissal before his statutory hearing. *Id.* The court found that the board lacked impartiality at the statutory hearing due to its substantial pre-hearing familiarity with the facts of the case.

The Supreme Court and the Third Circuit Court of Appeals have substantially altered the course of the law since *King* was decided. To be sure, the Due Process Clause guarantees that the decisionmakers must be impartial when a state agency is required to provide a hearing concerning a deprivation of a property interest. *Goldberg v. Kelly,* 397 U.S. 254, 271, 90 S.Ct. 1011, 1022, 25 L.Ed.2d 287 (1970); *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955). However, cases have consistently held that a board is not *per se* biased simply because it performs numerous functions such as investigation and adjudication. *See, e.g., Withrow v. Larkin,* 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975) (board's ability to suspend physician's license, initiate, investigate and adjudicate charges against physician does not constitute denial of due process absent demonstration of actual bias or risk of bias); *Matter of Seidman,* 37 F.3d 911 (3d Cir.1994) (Director of OTS's ability to authorize investigation, determine whether charges should be brought, issue notice of charges, and to decide charges as to law and fact does not constitute denial of due process absent showing of actual bias or risk of bias). To the contrary, there is strong presumption of impartiality which is not lightly rebutted, and only in "the most extreme of cases" will it be overcome. *Aetna Life Ins. Co. v. Lavoie,* 475 U.S. 813, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986); *Withrow,* 421 U.S. at 47, 95 S.Ct. at 1464 (due process challenge to investigative and adjudicative functions vested in one board carries "a much more difficult burden of persuasion" and "must overcome a presumption of honesty and integrity in those serving as adjudicators").

In *Withrow,* 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712, the Supreme Court considered a challenge to a state statute which allowed the State Examining Board to investigate professional misconduct by physicians and later make the determination whether the physician's license should be revoked. The powers entrusted to the board included the powers to warn and reprimand, temporarily suspend a license, and to institute criminal action or action to revoke a license if the board finds probable cause to believe that a violation has occurred. *Id.* at 37, 95 S.Ct. at 1459–60. The board first held an investigative hearing, which the physician and his counsel could attend, but the physician did not have the right to cross-examine witnesses. *Id.* at 39, 95 S.Ct. at 1460–61. A

subsequent hearing was scheduled at which the board would consider evidence to determine whether the license would be suspended, *id.* at 40–41, 95 S.Ct. at 1461, thus changing the board's function from an investigatory body to a decisionmaker on the issue of suspension of the license. That hearing was enjoined by the district court, and in lieu thereof, the board held another investigative session at which it made a finding of probable cause that a violation occurred and that an action to revoke the license should be instituted. *Id.* at 41, 95 S.Ct. at 1461.

Subsequent to that meeting, a three-judge district court declared that the statutory regime was unconstitutional, answering in the negative the constitutional question whether "for the board temporarily to suspend Dr. Larkin's license at its own contested hearing on charges evolving from its own investigation would constitute a denial to him of his rights to procedural due process." The Supreme Court reversed. *Id.* at 46, 95 S.Ct. at 1464. The Court first noted that a "biased decisionmaker [is] constitutionally unacceptable," and identified various scenarios in which the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable, such as where the adjudicator has a pecuniary interest in the outcome, or where he has been the target of personal abuse or criticism from the party before him. *Id.* at 47, 95 S.Ct. at 1464. However, the Court refused to extend the presumption of bias inherent in those factual contexts to a situation where the adjudicator acts first as investigator and then as adjudicator, without more.

> The contention that the combination of investigative and adjudicative functions necessarily creates an unconstitutional risk of bias in administrative adjudication has a much more difficult burden of persuasion to carry. It must overcome the presumption of honesty and integrity in those serving as adjudicators; and it must convince that, under a realistic appraisal of psychological tendencies and human weaknesses, conferring investigative and adjudicative powers on the same individuals poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guar-

antee of due process is to be adequately implemented.

*Id.* at 47, 95 S.Ct. at 1464.

In reaching its decision, the *Withrow* Court relied on *FTC v. Cement Institute,* 333 U.S. 683, 68 S.Ct. 793, 92 L.Ed. 1010 (1948). That decision presented a set of facts analogous to those in the case *sub judice,* in that the agency empowered to render the ultimate decision had information extraneous to the proceedings which it had gained during an external investigation. There, the FTC had instituted proceedings concerning the respondent cement industry's pricing system. Respondents demanded that the Commission members be disqualified because at some point before the FTC had filed its complaint, it had investigated respondents' pricing systems and reported its findings to Congress and to the President, and testified before congressional committees on the legality of such pricing systems. *Id.* at 700, 68 S.Ct. at 803. Some of the Commission members had even opined that the pricing systems were illegal. *Id.* Respondents challenged the FTC's impartiality, arguing that "such an opinion [of illegality] had been formed by the entire membership of the Commission as a result of its prior official investigations." *Id.* The Supreme Court rejected the challenge, stating:

> [T]he fact that the Commission had entertained such views as the result of its prior *ex parte* investigations did not necessarily mean that the minds of its members were irrevocably closed on the subject of the respondents' basing point practices. Here, in contrast to the Commission's investigations, members of the cement industry were legally authorized participants in the hearings. They produced evidence—volumes of it. They were free to point out to the Commission by testimony, by cross-examination of witnesses, and by arguments, conditions of the trade practices under attack which they thought kept these practices within the range of legally permissible business activities.

*Id.* at 701, 68 S.Ct. at 803.

The Third Circuit appellate court considered a similar issue in *Matter of Seidman,* 37 F.3d 911. There, the chairman of a savings

and loan association and one of its officers brought a challenge to the order of the Director of the Office of Thrift Supervision ("OTS"), which removed the chairman and publicly reprimanded the officer for their activities in connection with certain loan transactions. The OTS, upon obtaining information that appellants were engaged in unlawful conflict of interest practices, began investigations into appellants' business. *Id.* at 920. OTS began its investigation by deposing appellant Seidman, chairman of the board, and then determined that charges should be brought against both appellants. *Id.* at 920–21. On the same day, OTS notified appellants of the charges against them, it issued a preliminary order of suspension, removing Seidman from his post at the financial institution without pay. *Id.* at 921.

OTS then referred the investigation to a Treasury Department Administrative Law Judge ("ALJ"), who held hearings on the charges against appellants. *Id.* The ALJ issued a decision recommending that the Director of OTS remove and permanently bar appellant Seidman from working in the banking field (the "Removal and Prohibition Order"), assess civil penalties, and order appellant Bailey, an officer, to cease and desist from engaging in unsafe or unsound business practices. *Id.* Appellants sought review with the Director of OTS and requested oral argument. Oral argument was denied, and the Director issued the Removal and Prohibition Order recommended by the ALJ. The Director also made additional findings of fact regarding other unlawful practices engaged in by appellants. Because this decision was made *ex parte*, appellants had no opportunity to contest or challenge the additional findings made by the Director.

Appellants challenged the statutory scheme authorizing the Director of OTS to act, alleging that the Director was not an impartial decisionmaker, given all the functions he performed. Under 12 U.S.C. § 1818(e), the Director of OTS has the power to authorize an investigation, determine whether charges should be brought, issue notice of charges, and then decide them as to law and fact. *Matter of Seidman,* 37 F.3d at 924 (citing 12 C.F.R. §§ 509.4, 509.18 (1993)).

The ultimate decision is entirely the Director's, and while the ALJ typically hears the charges, the Director is free to disregard not only the ALJ's legal conclusions, but also his findings of fact and findings on credibility. *Id.* Notwithstanding the aggregation of functions in the one person, the Third Circuit appellate court rejected the due process challenge because the appellants had failed to show actual bias or likelihood of bias sufficient to rebut the presumption of impartiality on the part of the agency adjudicator.

Plaintiff argues that *Withrow* and *FTC* are inapposite because they deal with the collective decisions made by a board or commission, rather than decisions made by one person. The Third Circuit appellate court in *Matter of Seidman,* discussed above, considered and rejected the argument that individual decisions should be analyzed differently than board decisions.

> [Plaintiff] contends that *Murchison,* not *Withrow,* controls when the power of decision is vested in one individual instead of a multi-member board or commission. His argument implies that bias is inherent in such a process because it permits a single person to act as prosecutor, investigator and adjudicator as to the severe sanctions of section 1818(e). We think *Withrow* implies the contrary and actual bias or a likelihood of bias must appear if an otherwise valid administrative sanction is to be overturned because of a denial of due process. *Though in* Withrow, *a board, not a single person, combined the functions which the Director of OTS possesses under section 1818(e)(1), we do not think that distinction is controlling.*

*Id.* at 925 (emphasis supplied).

 *Withrow* and its progeny clearly dictate the requirements of due process with respect to challenges to post-termination review procedures, and stand for the proposition that the presumption of impartiality is not lightly rebutted. The combination of roles of investigator and decisionmaker with respect to suspension and termination does not give rise of a constitutional violation, absent evidence of actual bias or likelihood of bias. The Court now turns to the record to determine whether plaintiff has demonstrat-

ed actual bias or likelihood of bias, as required to make out a due process challenge. *See Withrow,* 421 U.S. at 47, 95 S.Ct. at 1464–65. The Court finds that plaintiff has not.

The facts surrounding plaintiff's post-termination grievance procedures demonstrate that plaintiff's due process rights were not violated. On April 17, 1995, in response to plaintiff's request for a grievance hearing under Step III of the Grievance Policy, Booker notified plaintiff that a three-member panel would be appointed by the Chief of Police to hear the appeal. D.I. 1, ¶ 9. Although the Grievance Policy provides that either the City Manager or the Chief of Police may appoint the panel, in this case, the Chief of Police appointed the panel, an act which removed any possibility of bias which might have resulted if the City Manager, *i.e.,* Booker, had formed the panel.[1] Plaintiff does not contend that the panel was biased.

The Step III hearing was held on May 24, 1995. *Id.* ¶ 10. The panel heard testimony by both plaintiff and Brown, and made numerous findings of fact. The panel did not believe plaintiff's version of the events which occurred at his house on March 24, 1995. D.I. 15 at Exh. I. Instead, it found that the "facts raise the appearance that the wire was being loaded in a hurry." *Id.* The panel further noted the discrepancies between Brown's description of the scene at plaintiff's house, and plaintiff's description, and concluded; "[t]he Panel believes Officer Brown, as an independent observer, is a credible witness and that Mr. Walls' statements and demeanor indicated he was less than truthful with Officer Brown." *Id.* The Panel noted that the amount of scrap copper wire disposed of by Milford had substantially diminished over the months preceding the date Brown observed plaintiff at his residence and his vehicle loaded with wire. *Id.* The Panel concluded:

> Based on the testimony presented, the Panel unanimously recommends that the decision of the City Manager to terminate Mr. Walls was justified and that substantial evidence exists that theft of City property had occurred and Mr. Walls' actions indicate an attempt to cover up the theft by removal of the material. Mr. Walls has an excellent employment personnel record and termination from employment while a serious and unfortunate occurrence, is justified due to the seriousness of Mr. Walls' conduct.

*Id.* As the panel noted, this decision was reached after hearing the testimony of both plaintiff and Brown.

The final step in the Grievance Policy was an appeal of the panel's decision to the City Manager, Booker. Booker presided over the appeal despite plaintiff's objection, and upheld the panel's recommendation. However, this fact, without more, does not demonstrate bias or likelihood of bias. The panel had submitted written findings of fact and a recommendation on which Booker could rely during the final appeal. Further, the evidence in the record concerning the possibility of Booker's bias cuts *against* plaintiff's position:

> Counsel for Plaintiff: Did [Walls] have an opportunity to present any further information to you to assist you in making your decision?
>
> Booker: Yes, he did, if that information had been available.
>
> Q. Did you ask him for any additional information that he had?
>
> A. Yes, I did. At that particular time the information that I had available to me, and Mr. Walls' personnel record, I had really hoped that he would produce something that would convince me otherwise.
>
> Q. In terms of the final decision after the grievance procedure had been completed, I think you already stated that it was your determination that it was your responsibility to make that decision.
>
> A. Yes.
>
> Q. At that time do you feel that you had an open mind in making that decision?

---

1. Steps I and II, which respectively provide for intermediate review by the employee's direct supervisor and Department Head, were bypassed in Walls' case because Carey, Walls' supervisor and the Department Head of the Electric Department, who would have held the meetings under Steps I and II, had resigned after being implicated in the theft.

A. Yes, I do.

Q. Even though you had made the original determination?

A. In spite of that fact, I still believe I had an open mind.

Q. Do you feel that you had any bias toward that final outcome of your decision?

A. If I had any bias it was probably in Mr. Walls' favor, based on his personnel record.

D.I. 15 at A–9–11. These statements give further support to the judicially-created presumption of honesty and integrity in those serving as adjudicators. *See Withrow,* 421 U.S. at 47, 95 S.Ct. at 1464–65. Plaintiff states that these assertions are self-serving and deserve little weight. While the statements by Booker may be self-serving, the Court must assume they are true.

Plaintiff argues that bias is demonstrated by Booker's remark that after receiving the anonymous telephone call and hearing Brown's account of what he saw at Walls' residence, he "put the burden of proof on Mr. Walls" to convince Booker that he was not engaged in any unlawful activity. D.I. 16, Exh. A at 31. Plaintiff argues that this statement is conclusive evidence that Booker was not impartial. The Court disagrees. As an initial matter, there is nothing in the record which indicates that Booker is anything other than a lay person who does not appreciate the legal import of the phrase "burden of proof." The context in which this comment was made supports this observation. Counsel for plaintiff had been questioning Booker on concepts of due process, attempting to elicit Booker's interpretation of this constitutional phrase. The record only contains a portion of this colloquy, which begins with counsel's somewhat inaccurate interpretation of due process:

Counsel for plaintiff: Would you agree with me that due process after the fact is not really due process?

Booker: No, I would not, because I don't think you can have due process until an action takes place. And again, there were opportunities prior to the actual termination that could have alleviated the whole process if I could have been convinced otherwise, had this incident not occurred.

Q. I understand your position is that Mr. Walls had an opportunity initially to convince you otherwise.

A. (The witness nodded head up and down.)

Q. Do you feel he had an obligation to convince you otherwise, as you saw it, from the city manager at that point, who had the burden of proof?

A. Based on the anonymous phone call that I received, from the reaction from Detective Brown upon arriving at Mr. Walls' premises, I did put the burden of proof on Mr. Walls.

*Id.* Reviewing this conversation, while Mr. Booker did use the phrase "burden of proof," that phrase was clearly suggested to him by plaintiff's counsel. It also is clear that what Booker was attempting to explain was his entirely appropriate act of turning to Walls, after hearing allegations of wrongdoing, for an explanation. No fair reading of this conversation would support plaintiff's view that Booker acted, from the inception of the investigation through the final appeal, with a presumption of *guilt* on the part of Walls that Walls had the burden to rebut. Booker's use of the phrase "burden of proof" was nothing more than a layman's attempt to articulate his instinctive reaction to ask Walls for his side of the story.

Furthermore, it also bears noting that counsel was specifically limiting this discussion to Booker's *first* meeting with Walls after he heard about the activity at Walls' residence, long before he made the decision to suspend, let alone terminate or make the final adjudication as to Walls' employment. Counsel stated: "I understand your position is that *Mr. Walls had an opportunity initially to convince you otherwise.*" Booker's response that he looked to Walls for an explanation, when put in this context, is innocuous.

The sole issue remaining is whether the fact that Booker made his initial determination to terminate Walls on the basis of a police report, the existence of which was allegedly unknown to Walls, impermissibly influenced his decision at Step IV of the grievance procedure so as to rise to a constitutional violation. Stated differently, has

plaintiff shown a likelihood of bias within the meaning of *Withrow*, given the fact that Booker, in his capacity as ultimate decision-maker on the termination issue, had exclusive knowledge gained from his initial involvement as the person who directed the investigation? Plaintiff's argument is that the undisclosed police report tainted the post-termination procedures, because this information, upon which Booker initially relied, infected Booker's fairness during his ultimate adjudication under Step IV of the Grievance Policy. This question was raised for the first time at oral argument, held on July 11, 1996, and must be answered in the negative.

None of the cases discussed above has found a constitutional violation stemming from the decisionmaker's knowledge of facts which were not specifically addressed at the hearing. In *Withrow*, the Supreme Court clearly rejected this argument, stating:

> No specific foundation has been presented for suspecting that the Board had been prejudiced by its investigation or would be disabled from hearing and deciding on the basis of the evidence to be presented at the contested hearing. *The mere exposure to evidence presented in nonadversarial investigative proceedings is insufficient in itself to impugn the fairness of the Board members at a later adversary hearing.*

*Id.* at 55, 95 S.Ct. at 1468 (emphasis supplied). In a factual context similar to the case *sub judice*, in *Copeland*, 840 F.2d 1139, the Third Circuit appellate court rejected the argument that the city's failure to provide the specific results of a drug test appearing in a written report to the police officer suspected of drug use amounted to a due process violation. "Although it might have been desirable for the city to have advised him of the specific test results appearing in the report, we cannot say that failure of the city to provide such information amounted to a constitutional violation under these circumstances." *Id.* at 1145 (footnote omitted); *cf. Hopkins v. Mayor and Council of Wilmington*, 600 F.Supp. 542, 550 (D.Del.1984) ("[t]hat is not to say that because the board members were cognizant of rumors unfavorable to the plaintiff, they necessarily reached an adverse decision without considering the

record. That view would contradict the litany of Supreme Court precedent that requires more than 'mere familiarity with the facts of a case' to disqualify a decision maker.") (citations omitted).

Walls is essentially making the same challenge made by the cement industry in *FTC, supra*. He argues that Booker's impartiality was tainted by his reliance on the police report when he first made the initial decision to terminate Walls. Walls argues that he was denied a meaningful opportunity to grieve the decision in the post-termination stage because he never knew about the police report, and therefore was in the unenviable position of attempting to defend himself without knowing all the considerations which formed the basis of Booker's decision. Walls further argues that even if Booker did not consider the police report at the final stage, Booker's impartiality was nonetheless tainted, because the previously-considered information can not simply be erased from Booker's mind.

However, *FTC* addresses this precise issue and rejected the due process challenge. Like the FTC, Booker had information derived from *ex parte* investigations which formed the basis of his decision to terminate Walls. Also like the FTC, Booker had obviously formed the opinion that Walls had violated the law. And like the members of the cement industry in *FTC*, Walls had the opportunity to present evidence, with counsel, to the undisputedly objective review panel, and then to Booker, to demonstrate that he had not engaged in any illegal activity.

Even assuming *arguendo* that there were legal merit to this argument, plaintiff has not shown that this report contained any information to which he was unable to respond at the Steps III and IV hearings. As noted above, Brown testified as to what he saw at plaintiff's residence, which was subsequently documented in his report, at the hearing before the panel. Further, while plaintiff and his counsel take the position that they never knew about the police report, thereby denying them the opportunity to respond to the charges both before and after the termination, correspondence to plaintiff belies this assertion. Booker's suspension letter of

March 27, 1995 specifically informs Walls that his suspension was ordered "pending a police investigation of allegations regarding the theft of City property and your role in that theft." D.I. 12, Exh. C. Booker's termination letter of April 12, 1995, also specifically refers to the investigation, stating: "Due to the results of the City's investigation into allegations surrounding the theft of City property by you, I believe there is sufficient cause for your dismissal." D.I. 12 at Exh. D. Given these letters, plaintiff had at least some indication that a police investigation was ongoing. Plaintiff then retained counsel before the Step IV hearing. Certainly, counsel should have known to request any written reports made in connection with a police investigation, *to which his client had twice been alerted,* to the extent counsel deemed such report to be pertinent.

Plaintiff finally argues that Booker's impartiality is suspect because several months had passed since Booker's initial decision to suspend and terminate, as well as since the Step IV hearing, and as a consequence, Booker would be unwilling to change his mind at that late date. That argument was also rejected in *Withrow.* The Supreme Court rejected the notion that bias could be inferred simply from a risk that once an initial decision is made, the same person, who reviews that decision at a later date, would be unwilling to change his mind and admit that he had erred.

> The risk of bias or prejudgment in this sequence of functions has not been considered to be intolerably high or to raise a sufficiently great possibility that the adjudicators would be so psychologically wedded to their complaints that they would consciously or unconsciously avoid the appearance of having erred or changed position. Indeed, just as there is no logical inconsistency between a finding of probable cause and an acquittal in a criminal proceeding, there is no incompatibility between the agency filing a complaint based on probable cause and a subsequent decision, when all the evidence is in, that there has been no violation of the statute.

*Withrow,* 421 U.S. at 57, 95 S.Ct. at 1469; *see also Matter of Seidman,* 37 F.3d at 926

("Any interest the Director might have in sustaining his own charges is no different than the board had in *Withrow.* Seidman has not shown bias or a likelihood of bias.").

In light of the fact that plaintiff has offered no evidence in the record which rebuts Booker's impartiality, plaintiff's motion for summary judgment based on the post-termination procedures will be denied.

### IV. Conclusion

Plaintiff was given notice and opportunity to respond to the charges brought against him in the pre-termination period. Further, plaintiff has placed no evidence in the record which demonstrates actual bias or likelihood of bias on the part of Booker in his capacity as ultimate decisionmaker in the post-termination grievance procedure. Plaintiff's motion for summary judgment will be denied. An appropriate order will be entered.